*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0318p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ZEF PERGEGA,

|                                | *Petitioner,* |              |
|--------------------------------|---------------|--------------|
|                                |               | No. 04-3479  |
| *v.*                           |               |              |
|                                |               |              |
| ALBERTO GONZALES,              |               |              |
|                                | *Respondent.* |              |

On Appeal from the Board of Immigration Appeals.
No. A77 843 083.

Argued: June 1, 2005

Decided and Filed: July 28, 2005

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge; CLELAND, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Petitioner. Ari Nazarov, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent. **ON BRIEF:** Mary Massaron Ross, Camille Horne, PLUNKETT & COONEY, Detroit, Michigan, for Petitioner. Ari Nazarov, Emily A. Radford, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Zef Pergega, an Albanian national, lawfully entered the United States as a visitor in 1999. In 2000, the Immigration and Naturalization Service (INS) served him with a Notice to Appear, charging Pergega with overstaying his visitor's visa. Pergega conceded removability, but applied for asylum, the withholding of removal, and protection under the Convention Against Torture. His application was denied by an Immigration Judge (IJ), who determined that Pergega was not credible. Pergega's subsequent appeal was dismissed by the Board of Immigration Appeals (BIA), which also concluded that he was not credible. For the reasons set forth below, we **GRANT** the petition for review, **VACATE** the decision of the BIA, and **REMAND** the case for further proceedings consistent with this opinion.

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

## I. BACKGROUND

Pergega is a political journalist with a background in newsprint and television. His father studied at a liberal arts institute in Italy, and, because of this, Pergega claims that he and his family were subjected to persecution during the time that the Communist Party governed Albania. In 1951, the family was sent to the mines near Rrubik, Albania for "re-education," and Pergega lived there until his graduation from high school in 1971. He was then sent to work as a mechanic at the Fishing Department in Shengjin, Albania, where he claims that he was "under the surveillance and control of the employees of the government security, communists and members of the Communist Party."

Pergega also began working as a newspaper reporter during this time. In 1988, he wrote an article criticizing Albanian agricultural policies. The Communist Party responded to this article by sending Pergega to a camp in Kashnjet, Albania for "ideological re-education." By 1990, however, Pergega was again involved in political activity, this time working with anticommunist groups operating out of the city of Shkodra, Albania and writing prodemocracy newspaper articles.

Pergega was in Shkodra on January 4, 1990, the day before the bust of Joseph Stalin was to be toppled. According to his affidavit, the police came to his hotel room early that morning and took him to the police station for questioning. He was then "interrogated, beaten and tortured for three straight days." Upon his release, Pergega was warned not to become involved with antigovernment activities. Pergega nonetheless continued his political activism, participating in a hunger strike and working in various capacities for the opposition Democratic Party. He also continued to work as a political journalist.

In February and March of 1991, Pergega was allegedly detained five times by the police and "suffered repeated interrogations, brutal beatings, torture, and maltreatment." He was also detained by the police on April 2, 1991 and again on July 3, 1991. Pergega claims that he was handcuffed and beaten for several hours on the latter occasion.

The Democratic Party won an important election on March 2, 1992. After this shift in power, Pergega worked for a number of years at a Democratic Party newspaper. He also began working as a television journalist, producing and hosting news programs. Pergega was selected in 1996 by the Social-Democratic Union Party as a candidate for one of Albania's electoral districts.

On March 3, 1996, an Albanian television station aired a program by Pergega that was critical of Albanian Muslims. That night, two armed men came to Pergega's house. They knocked on the door and, when he opened it, threatened to kill him. Pergega's wife and son walked into the room, and, upon seeing the two men, started screaming and crying. One of the men ordered Pergega to tell his family to stop making noise; otherwise he would shoot Pergega. The other man purportedly told Pergega that "[i]f you ever criticize the Muslim community we will drop a bullet right in your mouth you stinking Catholic. And you better shut up." Pergega also stated that he had received at least one threatening phone call warning him to withdraw his candidacy in the election.

On March 10, 1996, Pergega was again assaulted in his home by an armed intruder. This man told Pergega that "this is the best vote that you can get as a candidate," and then pistol whipped Pergega, rendering him unconscious. Pergega was hospitalized and received treatment for internal bleeding and liver damage.

In March of 1997, the Democratic Party suffered a defeat. Shortly thereafter, on March 27, 1997, Pergega was accosted by three armed men. They forced Pergega into a nearby car and drove him to a city fortress on the outskirts of town. There, according to Pergega, "they beat me very much with their fists and kicked me and there was a point that I thought I was going to faint. My

body was all bloody and bruised because of the beatings. About two hours later some one called their leader [on] the cell phone and they let me free telling me not to tell anything to the police."

On June 19, 1998, Pergega was in the Socialist Party's headquarters for the purpose of obtaining a calendar of upcoming political events. He was accosted by a young man who instructed Pergega to follow him. The man led Pergega to an isolated office, whereupon he pulled out a gun and forced it in Pergega's mouth. He told Pergega that he had better not "write against Ndrec Pepa," a local political candidate.

On September 2, 1998, "a group of criminal gangs put an amount of tritoli" in the building where Pergega's office was located. ("Tritoli" is apparently a TNT-type explosive.) The resulting explosion made it impossible for him to use his office. In addition, Pergega claims that, on October 16, 1998, an unknown assailant threw gasoline on his son and attempted to set him on fire.

Political hostility eventually forced Pergega from his job as a newspaper reporter, and he began working as a television journalist. On January 4, 1999, Pergega appeared in a television program that chronicled problems in the city of Shengjin. The next day, while going to the studio to prepare another program, Pergega was confronted by two men. He claims that they "began to attack me and struck me in the face, and severely bleeding in the face I fell into the equipment and the other man grabbed the camera and slammed it onto the floor, destroying it." Pergega further contends that these men were working for the police.

On February 19, 1999, a television station in Lezhe aired a news program prepared by Pergega about the tearing down of a bust of the dictator Enver Hoxha. The next day, armed men came to Pergega's apartment. Pergega claims that the men attempted to attack and sexually assault his wife, but that the arrival of some neighbors scared away the attackers. Pergega's wife and children eventually sought psychological, as well as medical, help.

The next month, on March 14, 1999, the same television station aired a program prepared by Pergega that chronicled political killings in the country. After the program aired, Pergega claims that he was kidnapped by two men and taken to a police station in Tirana. He was allegedly beaten and placed in a small, isolated cell. Pergega said that he was repeatedly taken into an interrogation room where he was questioned by several police officers about his political activities. According to Pergega, "when I did not give them the answers that they wanted, the officers began to beat me with their rubber sticks and push me into the wall. They also tortured me and when I lost consciousness they returned me to my cell." He remained there until the next morning, when he was dropped off at a nearby bus station.

Following this incident, Pergega decided to leave Lezhe and went to Tirana to live with his brother. He alleges that, after his departure, police officers came to his parents' house on two separate occasions with warrants for his arrest. Pergega contends that the police detained and beat his father after the second visit, and threatened to kill him unless he "signed" for the search warrant. The police told Pergega's father to tell Pergega that "if I did not turn myself in, they would find me no matter where I went." Pergega subsequently fled Albania, arriving in the United States with a visitor's visa on August 19, 1999.

Pergega applied for asylum in November of 1999 and again in January of 2000. (He subsequently abandoned these applications for reasons not reflected in the record.) In March of 2000, the INS served Pergega with a Notice to Appear, charging him with being removable for overstaying his visitor's visa.

On December 19, 2002, the IJ issued a decision denying Pergega's request for asylum, the withholding of removal, and protection under the Convention Against Torture. This decision was based on the IJ's conclusion that Pergega was not credible. Pergega timely appealed to the BIA.

On March 18, 2004, the BIA dismissed his petition in a separate opinion that affirmed the IJ's finding of incredibility. This timely appeal followed.

## II. ANALYSIS

### A.       The BIA's adverse credibility determination

Pergega's principal claim on appeal is that both the IJ and the BIA erred when they determined that he was not a credible witness. This court has held that "[c]redibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Credibility determinations under this standard are "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). On the other hand, even though "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla*, 388 F.3d at 926. Indeed, the "adverse credibility finding must be based on issues that go to the heart of the applicant's claim. [It] cannot be based on an irrelevant inconsistency. If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (quotation marks and citations omitted).

The BIA relied on three alleged inconsistencies in concluding that Pergega was not a credible witness. First, it cited the fact that Pergega "testified that he did not report certain incidents to the police, but has submitted copies of reports he filed with the police." The BIA next noted that Pergega "testified that he was not mistreated during a detention that occurred in early April 1991, but his affidavit indicates that he was beaten." Finally, the BIA observed that Pergega "failed to include a February 1991 detention and beating on his affidavit."

The first inconsistency cited—whether Pergega reported certain incidents to the police—is a reference to the finding by the IJ that the events allegedly occurring on March 27, 1997 were not credible. On that date, Pergega claims that he was apprehended by three assailants, taken to a remote castle, and kicked and beaten for two hours. The IJ found that

> [t]he events of March 27, 1997 are incredible. On cross-examination, as well as direct, Respondent clearly testified [that] the incident was never reported to any governmental authorities. However, Respondent submitted and signed what purports to be an incident report issued by an Albanian prosecutors office. It details, with some inconsistency, the very events he testified to.

During the hearing, Pergega was explicitly asked about this inconsistency. The colloquy, which appears to involve significant misunderstandings on both sides, proceeded as follows:

> Q:     And at 11:00 in the morning [of March 27], sir, where, where were you in Lezhe?
> A:     I, okay, I was in front of the police station's window.
> Q:     And what were you doing there, sir?
> A:     I went there to get information in regard to the police at their press, the person in charge there for the press.
> . . .
> Q:     Now the incident March 27 from 1997 when three armed men placed you in a car, you didn't report that to the authorities either, did you?
> A:     The event took place, the event took place right in front of police officers that were—
> Q:     Sir—
> A:     Looking at the event. They saw the scene and none of them intervened.

Q:    Sir, you didn't report it to the authorities did you?
A:    No.
. . .
Q:    Can you explain, sir, why your application, I do not have the original, contains a report signed by you of that incident made to a prosecutor's office, your March 27th incident?
A:    I've done two reports, reports of the police.
Q:    When did they occur, sir?
A:    On May 10th and also the event of the Catholic church on March 3rd.
. . .
Q:    March 3rd?
A:    The event of the Catholic Church, March 3rd.
Q:    Sir, why does your application have a report made to the prosecutor or officer of judiciary police of the, of the events of March 27th, which is supposedly signed by you sir?
A:    That is true. I report it.
Q:    Well, you just said you didn't, you had only made two reports.
A:    I did not understand the question very well. I didn't understand the question very well. These are, that's a police report.

The altercation is further described in Pergega's affidavit, in which he states that he was accosted by three men. He claims that they took him to the city's fortress where they beat him for about two hours. At that point, he contends that one of the men received a call on his cell phone, and he was then set free with the warning "not to tell anything to the police."

Based upon the record as described above, we conclude that the BIA's determination that Pergega lacked credibility regarding the March 27, 1999 incident is not supported by substantial evidence. First, Pergega testified that he was accosted by the three men *in front of a police station window*. A number of police officers might have been watching the altercation, and any one of them could have independently filed the police report and later obtained Pergega's signature. Such a series of events would have provided a logical and consistent explanation for the presence of the police report included in Pergega's asylum application. Second, the colloquy at trial suggests that Pergega was genuinely confused about what the IJ was asking. Pergega repeatedly refers not to the March 27 altercation, but instead to separate events that took place on March 3 and May 10. Furthermore, when he responded in the affirmative to the question of whether he "reported" the March 27 altercation, Pergega may very well have been referring to a *press* report he prepared—not to the police report. Such considerations make the quoted testimony an unreliable basis on which to make an unfavorable credibility determination.

And even if such an instance does evince a degree of inconsistency on Pergega's part, the "adverse credibility finding must be based on issues that go to the heart of the applicant's claim. [It] cannot be based on an irrelevant inconsistency." *Sylla*, 388 F.3d at 926 (quotation marks omitted). Whether Pergega *reported* the kidnapping and beating to the police is less relevant than the fact that he was *actually* kidnapped and beaten. The INS does not dispute that Pergega was in fact abducted, threatened, and physically abused on March 27, 1997. Indeed, the police report that purportedly undermines Pergega's credibility actually supports his claim of past persecution.

The second inconsistency cited by the BIA involved an April 1991 detention. In his affidavit, Pergega states that, on April 2, 1991, he was reporting from a demonstration when

we were surrounded by police and being attacked by them, and artillery was all over the place. They started to forcefully spread the demonstrators. They began to arrest the demonstrators in front lines, one of them being me. After very brutal

interrogations sessions, which occurred repeated [sic] and included beatings and torture, with no explanation I am let go home on July 3, 1991.

But Pergega's testimony concerning this particular detention clearly paints a different picture. He began by explaining that he was at the demonstration "when weapons were shot at the crowd." He then said:

A:      [A] crowd of policemen grabbed me by using force and took me to the police station. On the way there they put me on the floor of their van, and put their feet over me, stepped on me.
Q:      What happened when you arrived at the police station?
A:      I was kept at the police station. And I was questions [sic], questioned several times with intervals in between.
Q:      How long were you kept at the police station?
A:      Three days.
Q:      Were you, were you only questioned or were you mistreated as well?
A:      I only was questioned.

Pergega's testimony indicates that he was detained for only three days without physical mistreatment. His affidavit, on the other hand, claims that he was detained for three months and brutally beaten.

Pergega explains these inconsistencies by insisting that there were errors in the translation of his initial affidavit. In particular, he claims that the individual who translated the affidavit misinterpreted "three days" to mean "three months." He further explained that, before the deportation hearing, his representative alerted the IJ to this error, and that the INS and the IJ accepted this correction and then apparently ignored it. The INS, for its part, does not dispute that Pergega attempted to correct this error in translation. Neither does the INS dispute Pergega's contention that this correction was accepted, and then ignored, by the IJ.

In addition, the INS and Pergega's representative orally agreed during the deportation hearing that, if asked, Pergega would testify in accordance to what was contained in his affidavit regarding the events that took place before March of 1996. Because the April 2, 1991 incident was covered by the stipulation, there was little incentive for Pergega's representative to correct the record or to provide the IJ or the BIA with a revised affidavit. Based upon this exchange between Pergega and the INS, the alleged inconsistencies regarding the April 2, 1991 incident provide no support for an unfavorable credibility determination.

The final instance cited as an inconsistency by the BIA is plainly unsupported by the record. Pergega, according to the BIA, "failed to include a February 1991 detention and beating on his affidavit." But the affidavit plainly states that, "[i]n February-March 1991, I was detained 5 times by the police, because of my political activities and I suffered repeated interrogations, brutal beatings, torture, and maltreatment." The BIA was therefore mistaken when it concluded that the February 1991 detention and beating was not mentioned in Pergega's affidavit.

In sum, all of the reasons given by the BIA for concluding that Pergega's testimony was not believable are inadequate to sustain an adverse credibility finding. The first reason fails because a police report about the March 27, 1997 incident could have been filed without Pergega's instigation. *Who* filed the police report, moreover, does not go "to the heart of the applicant's claim." *Sylla*, 388 F.3d at 926. The second inconsistency cited by the BIA, regarding the April 2, 1991 incident, was subject to both an oral correction before the deportation hearing and a stipulation on the record at the hearing. And the third claimed inconsistency regarding a February 1991 detention proves not to be an inconsistency at all. The adverse credibility determination reached by the BIA was

therefore not based on substantial evidence.  Because we believe that any reasonable adjudicator, evaluating the three instances cited by the BIA, would be compelled to conclude that the INS had not shaken Pergega's credibility, we reverse BIA's adverse credibility determination.

**B.       Pergega's past persecution and well-founded fear of future persecution claims**

The BIA based its decision solely on Pergega's alleged lack of credibility.  In light of our reversal of the BIA's credibility determination, we remand to the BIA for further consideration of Pergega's claims of past persecution and well-founded fear of future persecution.  *See Sylla*, 388 F.3d at 930 (finding that the record did not support the BIA's adverse credibility finding and remanding the case to the BIA for further proceedings); *Huang v. Ashcroft*, 113 Fed. Appx. 695, 700 n.4 (6th Cir. 2004) (unpublished) (noting that when the court reverses an adverse credibility finding, "remand to determine whether [the petitioner] qualifies as a refugee is the appropriate remedy"); *see also INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) ("[A] court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.  This principle has obvious importance in the immigration context.").

**C.       Pergega's due process rights**

Pergega further contends that his hearing before the IJ suffered from a litany of procedural errors that impaired his ability to have a fair hearing.  He argues, correctly, that the "Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing."  *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001).  "To constitute fundamental unfairness, however, a defect in the removal proceedings must have been such as might have led to denial of justice."  *Allabani v. Gonzales*, 402 F.3d 668, 676 (6th Cir. 2005) (quotation marks omitted).  Because we are reversing the BIA's adverse credibility finding and remanding the case for further consideration of Pergega's application, we have no need to consider these alleged procedural errors at this time.  Pergega's procedural allegations would still be reviewable on a future appeal, however, if the BIA continues to rely on the already existing record.

### III.  CONCLUSION

For all of the reasons set forth above, we **GRANT** the petition for review, **VACATE** the decision of the BIA, and **REMAND** the case for further proceedings consistent with this opinion.