NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0023n.06
Filed: January 13, 2009

Case No. 07-3682

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| AMJAD MOHAMMED HAMADNA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM AN ORDER OF THE |
| | ) | BOARD OF IMMIGRATION |
| MICHAEL B. MUKASEY, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: DAUGHTREY and GIBBONS, Circuit Judges; ZATKOFF, District Judge.[*]

**Lawrence P. Zatkoff, District Judge.**   Petitioner filed his petition for asylum and withholding of removal on August 3, 2001.  The Immigration Judge ["IJ"] denied Petitioner's application for asylum because it was time barred.  The IJ also denied Petitioner's application for withholding of removal and torture-convention relief based on his determination that Petitioner's documents were not authentic and that Petitioner's testimony was both internally and externally incredible. On September 7, 2006, the Board of Immigration Appeals ["BIA"] dismissed Petitioner's appeal and affirmed the IJ's opinion denying Petitioner's application for asylum and withholding of removal.  Apparently an "error in administrative processing" prevented the decision from reaching Petitioner.  Accordingly, the BIA reissued its opinion on April 30, 2007.  The instant Petition for

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

Review to this Court followed. For the following reasons, we **DENY** the Petition for Review.

## I. BACKGROUND

According to Petitioner, he is a Palestinian male who previously worked as a police officer in Palestine, where he is affiliated with the Fatah party. In April 1999, the United States government allegedly recruited Petitioner along with 14 other men to attend a training course on explosives in the United States. Petitioner purportedly attended the course, which lasted approximately one month. Upon completion of the course, Petitioner claims to have received a certificate and a visa permitting multiple entries into the United States over a period of ten years.

When Petitioner returned to Palestine, he claims that he was approached by members of a militant faction of the Fatah party known as al-Aqsa Martyrs' Brigade, as well as members of Hamas, all of whom desired Petitioner to use his knowledge regarding explosives against the Israelis. According to Petitioner, because he rejected these solicitations, he feared persecution from the militant factions. Petitioner further maintains that he feared reprisal from Israel because, as a Palestinian police officer, he played a significant role in the arrest of four Israeli spies. Petitioner said that he escaped these conflicting pressures by returning to the United States on November 16, 1999, as a visitor for business.

Since Petitioner has returned to the United States, Israeli forces have apparently leveled Palestinian police installations and various terrorist groups have been targeting Palestinian police officers. In response to the escalating situation in Israel, Palestine, and the occupied territories, Petitioner filed his petition for asylum and withholding of removal on August 3, 2001.

## II. STANDARD OF REVIEW

Petitioner contests the IJ's determination, in which the BIA concurred, that his testimony was

2

incredible. This Court reviews the factual findings of the IJ, including adverse credibility determinations, under the deferential substantial-evidence standard. *Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005); *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004); *Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004). Under this standard, the IJ's findings are conclusive unless any reasonable adjudicator would be compelled to conclude the opposite. 8 U.S.C. § 1252(b)(4)(B); *Pergega v. Gonzales*, 417 F.3d 623, 627 (6th Cir. 2005); *Liti v. Gonzales*, 411 F.3d 631, 636 (6th Cir. 2005). It is insufficient for the Court to disagree with the evidentiary evaluation; the evidence must *compel* an opposite conclusion. *Sylla v. INS*, 388 F.3d 924, 925–26 (6th Cir. 2004).

### III. ANALYSIS

The IJ and the BIA determined that Petitioner was incredible on a number of issues. The IJ found specific and material inconsistencies in Petitioner's testimony as well as significant gaps in his testimony. The IJ also referenced the documents that Petitioner submitted in support of his claim. Some of these documents were undated letters containing acknowledged falsities. Arguably the most significant document, a certificate of completion from the alleged bomb-technician training course, was facially dubious.

Petitioner maintains that the inconsistencies arose from his incompetent interpreter. Further, Petitioner argues that any inconsistencies in his testimony do not go to the heart of his claim and accordingly cannot be held against him. Petitioner also contests the IJ's assessment of the bomb-technician certificate; Petitioner is adamant that the government should not dismiss the document when it is in the unique position of being able to verify its veracity and authenticity.

Adverse credibility findings rooted in inconsistencies are legitimate provided that the

3

inconsistencies relied upon go to the heart of the petitioner's claim.[1] *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007); *Sterkaj v. Gonzales*, 439 F.3d 273, 275 (6th Cir. 2006). Determining the credibility of a petitioner consists of an "overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence." *Matter of A-S-*, 21 I&N Dec. 1106, 1112 (BIA 1998) (quoting *Matter of Lugo-Guadiana*, 12 I&N Dec. 726, 729 (BIA 1968)). Adverse credibility determinations, while afforded substantial deference, must be supported by specific reasons. *Sylla*, 388 F.3d at 926.

Credibility may be negatively impacted by a number of factors, including inconsistencies between the petitioner's testimony and other witnesses' testimony, his own testimony, or supporting documents. *See, e.g.*, *Pilica v. Ashcroft*, 388 F.3d 941, 952–54 (6th Cir. 2004); *Amir v. Gonzales*, 467 F.3d 921, 925–26 (6th Cir. 2004); *Dorosh v. Ashcroft*, 398 F.3d 379, 381–83 (6th Cir. 2004). Dubious or questionable documents may also lead to an adverse credibility determination. *See, e.g.*, *Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005); *Desta v. Ashcroft*, 365 F.3d 741, 745 (9th Cir. 2004). When faced with a "close case," this Court has held that "because there was some evidence to support the adverse credibility determination, . . . the evidentiary record does not compel a contrary result. Because his testimony is not credible, [the applicant] has failed to demonstrate past persecution or a well-founded fear of future persecution." *Vasha v. Gonzales*, 410 F.3d 863, 871–72 (6th Cir. 2005).

Petitioner's testimony and submitted materials are fraught with inconsistencies, half truths,

---

[1] Effective May 11, 2005, credibility determinations may be based on "any inaccuracies or falsehoods in . . . statements, without regard to whether any inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. §§ 1158(b)(1)(b)(iii), 1231(b)(3)(C), 1229a(C)(4). These changes do not apply to Petitioner because he filed his application prior to the effective date.

and fabrications. Prominent among these is Petitioner's alleged certificate of bomb technician training completion. The certificate purports to be issued by "the United States Government" broadly, without designation of a particular agency that one might expect to conduct such training such as the Federal Bureau of Investigation; the Bureau of Alcohol, Tobacco and Firearms; or the Department of Homeland Security. The certificate is not signed but contains a typed font resembling script of the name "Sidney Williamson," who was allegedly the Director of Training. Petitioner testified that he never heard of anyone by the name of Sidney Williamson. Directly below the "signature" is a curious dating mechanism, which would normally correlate with the date of the signature. On the document, however, the "date" line indicates that the signature (or more likely the training) occurred on "5-23 April 1999." Petitioner argues that the government should be put to the task of verifying the authenticity of the certificate but references no authority to impose such a burden. Because much of Petitioner's application depends on his experience as a bomb technician, this document runs to the heart of his claim. On its face, however, the certificate is dubious at best. *See Sterkaj*, 439 F.3d at 275.

The certificate does not end the string of incredible documents submitted by Petitioner, who admitted that other documents contained falsities and exaggerations. For example, a letter from the Palestinian National Liberation Movement indicated that Petitioner had been shot by the Israelis and had been arrested on two occasions. Petitioner testified that he had never been shot and was imprisoned only once. Petitioner could not explain the disparities in the letter, stating that he was unaware who wrote the letter and that "the letter came from the authorities I was a member of, but the person that wrote it, he has added some information to it and he's the one who signed it also." Like the certificate, the letter goes to the heart of Petitioner's claim as he alleges that he fears reprisal

from the Israelis.

Petitioner's own testimony contains numerous inconsistencies that raise caution. For instance, Petitioner's application states that he feared reprisal from the Israelis for his role in the arrest of four Israeli spies. At different points in his testimony, however, Petitioner indicated that all four spies were executed, that only one was executed and the others imprisoned, that one was awaiting execution, and that all four escaped when the prison was bombed. These wide-ranging descriptions cast significant doubt on Petitioner's testimony.

Petitioner's testimony is also implausible and vague. Although Petitioner alleges to be a bomb technician, he could only speak in general terms regarding his training. Petitioner indicated that he "learned how explosives are built" but when asked to elaborate could only state, "This particular subject of explosives is really wide. It's a big subject." Further questioning led to the positing of a hypothetical situation in which a building contained a bomb. When asked how he was trained to handle such a situation, Petitioner explained, "I would first wear those protective clothing, and then we would take the required precautions around the building. And then we go and deal with it." Petitioner's most specific testimony revolved around the equipment he would use in diffusing bombs: "X-ray, remote control, everything that would be, clothings (sic), also there's a big container that we can put the explosive in it." Petitioner's testimony demonstrates only a rudimentary understanding of explosives. Further, Petitioner intimated that all of the training occurred indoors, including the witnessing of "all kinds of explosion, with a car, with the train, railroad tracks, with a building. Also a tree." The prospect that all of these explosion demonstrations were conducted indoors is also incredible.

Petitioner's contention that inconsistencies arose because of ineffective interpretation is not

6

supported by the record. Although Petitioner attempted to answer several times in English rather than Arabic, there is no indication that this resulted from dissatisfaction with the interpreter. Petitioner also argues that his interpreter's incompetence is apparent from the fact that the IJ had to order the interpreter to translate one of his statements. Although the IJ did ask the interpreter to translate one of his statements, the transcript indicates that Petitioner had started to answer in English, implying that he understood what was being said. Any problem arising from this delay in translation was addressed immediately by virtue of the subsequent translation. At one point in the proceedings, Petitioner did state, "I don't understand what [opposing counsel] is talking about." Countless explanations for a solitary misunderstanding exist, including the vague nature of the question about which Petitioner was speaking: "[After arriving in New York,] What did you do?" Petitioner in this case does not allege that the interpreter spoke a different dialect or erred in translation. *Compare Tun v. Gonzales*, 485 F.3d 1014 (8th Cir. 2007) (reversing and remanding where native Burmese speaker informed the court that the translator was improperly translating Burmese to the petitioner) *and Amadou v. INS*, 226 F.3d 724 (6th Cir. 2000) (reversing and remanding where interpreter spoke a different dialect than the petitioner). The few isolated incidents Petitioner raises do not explain the numerous inconsistencies in his testimony or the dubious documents and do not affect the outcome of the matter.

The IJ dismissed Petitioner's petition for asylum on the grounds that it was untimely and Petitioner's petition for withholding of removal on credibility grounds. The IJ's finding that Petitioner was incredible is grounded in specific facts supported by the record. The documents Petitioner submitted are dubious at best and complete fabrications at worst. Petitioner's testimony contains numerous inconsistencies and raises doubts as to his status as a bomb technician. Because

7

the IJ's adverse credibility determination is supported by the record, and the evidence does not compel an opposite conclusion, Petitioner's asylum claim would have properly been denied even if it had been deemed timely. Claims for withholding of removal require a greater quantum of proof than do asylum claims. *Vasha*, 410 F.3d at 875; *Pilica*, 388 F.3d at 955. Therefore, on account of Petitioner's incredibility, his withholding-of-removal claim was also properly dismissed.

## IV. CONCLUSION

For the foregoing reasons, we **DENY** the Petition for Review.