TARNOW, District Judge,
dissenting.
I dissent, because I believe that the IJ’s adverse credibility determination was not supported by substantial evidence, and because I remain convinced that Soumare has shown that he suffered persecution in the past.
I. Adverse credibility finding
The IJ focused on minor discrepancies between the written statement and the hearing testimony, which are not inexplicably inconsistent: the two are reconcilable.[1] And because other evidence corroborates Soumare’s testimony, any reasonable adjudicator would be compelled to find that Soumare was credible. See Yu v. Ashcroft, 364 F.3d at 703 (in reviewing an adverse credibility finding, courts reverse only if any reasonable adjudicator would be compelled to conclude to the contrary).
A. 2001 Arrest
The first discrepancy is that Soumare testified that he was hit in the stomach during the 2001 arrest, but his written statement did not mention this fact. As the IJ explained, “his written statement simply talked about being grabbed by the shirt and thrown out the door, and did not indicate that he was struck in the stomach on that occasion, nor physically abused in any other way other than being doused with the water.” J.A. at 27 (IJ Dec. at 13).
But the failure to mention the stomach punch in the statement is not an inconsistency: Soumare (or his translator) could have just mistakenly omitted the stomach punch from his statement. There is a difference between an omission and an irreconcilable inconsistency.
Moreover, this is not an omission that, along with the other relevant omissions, is “significant enough to support an adverse credibility determination.” Mece v. Gon *85 zales, 415 F.3d 562, 573 (6th Cir.2005). This is so, because Soumare provided an examining doctor’s statement, which shows that the petitioner had suffered “injuries due to violent treatment while in prison” after the 2001 arrest. See J.A. at 265. This doctor’s statement corroborates Sou-mare’s testimony that he was punched. Thus, there is an independent reason to believe Soumare’s testimony, which minimizes the significance of the difference between the asylum-application statement and the testimony.
Though the government regards the doctor’s note as merely a form medical statement, I reject such a characterization. The statement is dated within a few days of Soumare’s 2001 arrest. There is no basis for suspecting that such a contemporaneous statement, offered by a doctor affiliated with the health ministry of the Mauritanian government, no less, is unreliable. And although the statement does not specifically outline what petitioner’s injuries were, the fact that Soumare received medical attention and that the doctor said that the injuries were “due to violent treatment while in prison” speak to the seriousness of Soumare’s injuries.
One last point about the 2001 arrest. The remaining, relevant elements were consistently rendered both in the written statement and in the testimony before the IJ. Both the statement and Soumare’s testimony explain that Soumare was slapped in the face by the police chief. Both the statement and testimony show that Sou-mare was attempting to reclaim his family home, the same home that his father had tried to reclaim and for which his father was beaten so severely that he died soon afterwards. The evidence compels the conclusion that it was not merely a housing dispute or a disturbance of the peace that resulted in Soumare’s arrest. Rather, the record is infused with evidence that the arrest and subsequent abuse occurred because Soumare, as a black Mauritanian, was attempting to assert rights that government officials wanted to deny. Both the written statement and the testimony indicate that Soumare was released only after the intervention of his brother-in-law, a White Moor.
B. 2004 Arrest
The other two relevant discrepancies relate to Soumare’s 2004 arrest at his workplace. First, the IJ noted that, as with the 2001 incident, Soumare testified to being hit in the stomach during this incident, but did not mention this fact in his statement. Here again, this discrepancy does not mean that the written statement and testimony are inconsistent. The discrepancy simply indicates that the detail about the 2004 stomach punch was omitted. Sou-mare gave an explanation for this omission: he thought that the translator wrote in the asylum-application statement all of the details Soumare reported. See J.A. at 132 (IJ Hrg. at 57) (“I thought the person who was writing every detail.”). In view of the internal consistency of most of Sou-mare’s testimony, acknowledged even by the IJ, as well as the corroboration of the 2001 incident, a reasonable fact-finder would have to conclude that missing details about Soumare’s physical treatment during the 2004 arrest do not give rise to the conclusion that this omission is significant enough to support an adverse credibility determination.
Besides, the gist of both the written statement and the testimony is that the police barged into Soumare’s workplace two and a half years after his 2001 arrest at the housing authority, angry that petitioner worked for a banned political party, which agitated for the rights of black Mauritanians. His written statement indicates that the police were still annoyed in 2004 *86 at his attempts to reclaim the family home from a White Moor. Given either of these reasons, the point is that Soumare was arrested for his work asserting the rights due to himself or others as black Mauritanians. While the detail about being punched in the stomach is omitted from the written statement’s narration of the 2004 arrest, the key elements of the event are intact: that he was arrested on account of his race, ethnicity, or political activity.
Second, the IJ noted a discrepancy between Soumare’s account of the circumstances of his 2004 arrest in his testimony and in his statement. Soumare testified that when police came to his workplace on May 9, 2004, they handcuffed him, put him in the car, and then drove him to the police station. However, in his written statement, Soumare said that the police simply asked him to follow them to the police station, where he was kept waiting until 2 p.m. This difference in narration does not present an inconsistency. It is entirely conceivable that the police approached Soumare, ordered him to follow them to the station, and subsequently handcuffed him and drove him to the station. There is no reason to presume an inconsistency between the written statement and Sou-mare’s testimony.
In sum, given that omissions from the written statement are explainable or irrelevant, the IJ’s factual determination — that Soumare was not credible — is not supported by substantial evidence. Rather, petitioner’s testimony should have been credited.
As for petitioner’s failure to provide a corroborating statement from his sister, I agree with the majority and would not find his failure to do so problematic. The question is not solely whether corroborating evidence is reasonably available, but whether it is reasonably expected. Because I believe that petitioner is credible and, in contrast to the majority’s view, has already been corroborated by other evidence — such as the doctor’s statement, the July 2004 summons,[2] his party-membership card, his father’s death certificate, his pay stub[3] from AFRITEL, and the testimony of his friend, Saidou Wane — a statement from Soumare’s sister was not necessary, especially where such a statement would necessarily be of limited corroborative value, given that it would have been generated solely for the purpose of benefiting her brother’s asylum claim.
II. Past Persecution
I agree that were Soumare’s testimony not to be credited, petitioner’s other evidence alone — without testimony to put that other evidence in context — would not suffice to show that he suffered past persecution. But because I believe that the adverse credibility finding was unsupported by substantial evidence, the other evidence strengthens my belief that petitioner has shown that he suffered past persecution due to the 2001 and 2004 arrests. I would adjudicate the merits of whether Soumare suffered past persecution notwithstanding Pergega v. Gonzales, 417 F.3d 623, 630-31 (6th Cir.2005) (remanding to BIA after reversing adverse credibility determination), because the BIA in Pergega based its decision “solely on [the asylum applicant’s] *87 lack of credibility.” In our case, on the contrary, the IJ did offer an alternative basis for finding that Soumare failed to meet his burden of showing past persecution. In my opinion, we therefore already have administrative action in the first instance for us to review on a substantial-evidence standard.
According to the IJ, even assuming all of Soumare’s testimony to be credible, the treatment he described did not constitute persecution on account of one of the protected grounds under 8 U.S.C. § 1101 (a)(42)(A). Discussing Soumare’s 2001 arrest and subsequent abuse by police, the IJ suggested that the incident arose out of an altercation between Sou-mare and housing authority officials rather than on account of a protected ground. I have already discussed why such an interpretation of the 2001 arrest is contrary to the record. In his written statement, Sou-mare emphasizes that he met with resistance on account of his race. Even as he was arrested in 2004, some two and a half years later, the policeman cited Soumare’s claim to the family home as he grabbed Soumare’s neck. This was not merely a property dispute.
Next, the IJ indicated that he did not believe that the treatment Soumare received during his 2001 arrest rose to the level of persecution. J.A. at 30 (IJ Dec. at 16). But being arrested and physically harmed to a degree that warrants medical attention on account of one’s race is enough for persecution.
III. Well-Founded Fear of Future Persecution
Had Soumare shown that he suffered past persecution, he would have been entitled to a rebuttable presumption that he also has a well-founded fear of future persecution. Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 21 (1st Cir.2004). He could also have attempted to independently show that he has a well-founded fear of future persecution, apart from the presumption he is entitled to. Id. Given the lapse in time since Soumare’s testimony before the IJ, it is not reasonable to say whether Soumare has independently established a well-founded fear of future persecution. We do not know, for instance, whether the government officials who threatened him with death, or other officials with similar animus towards black Mauritanians or Soumare in particular on account of a protected ground, are still in power, or whether continued political activity on behalf of black Mauritanians would subject him to persecution. Accordingly, I only maintain that Soumare has provisionally established his eligibility for asylum based on his demonstration of past persecution. I would have remanded to the BIA and ultimately to a different IJ, for consideration in the first instance of whether the government can rebut the presumption that Soumare has a well-founded fear of future persecution. Where an IJ has erroneously found that an applicant is not credible, the appearance of fairness requires that the case be assigned to a new IJ on remand.
I note, though, the unpersuasiveness of many of the reasons that formed the basis for the IJ’s conclusion that Soumare failed to show a well-reasoned fear of future persecution if he is removed to Mauritania. For example, the IJ noted that black Mauritanians, including Soninkes, had participated in the Mauritanian government in recent years. J.A. at 33 (IJ Dec. at 19). But some parliamentary representation for black Mauritanians does not rebut Sou-mare’s experience, particularly given the July 2004 summons, where the police threateningly warned Soumare’s sister that he should “leave the politics ... or ... would end up like [his] father.” J.A. at 116 (IJ Hrg. at 41).
*88 Though the IJ found no evidence in the record indicating that members of the political parties in which Soumare has participated were currently being persecuted in Mauritania, J.A. at 33 (IJ Dec, at 19), the AC party remained banned after the 2005 coup under the transitional government. J.A. at 167 (U.S. Dep’t of State 2005 Country Report on Human Rights Practices: Mauritania at 6). And the head of the PPA, to which Soumare most recently belonged, is the same person who led the AC party.
Despite the IJ’s observation that “the new leader who took over after the bloodless coup in 2005 has released numerous political prisoners in that country,” J.A. at 33-34 (IJ Dec. at 19-20), Soumare testified that “[m]y only security there, it was my brother-in-law, who was protecting me most of the time. If he’s not around ... they can come and take me, I would disappear in a minute.” J.A. at 136-37 (IJ Hrg. at 61-62).
I observe that, in order to establish a well-founded fear of future persecution, Soumare does not need evidence showing that members of his ethnic group (Son-inke) or black Mauritanians in general or the party to which he belongs (PPA/APP) are targeted for persecution in Mauritania on a widespread basis. Nor is the pre-suihption of a well-founded fear of future persecution necessarily rebutted by the fact that refugees from the 1989-91 crisis (in which Soumare’s family was deported) continued to return to Mauritania from Senegal, with many refugees able to reclaim their original homes and land. J.A. at 168 (U.S. Dep’t of State 2005 Country Report on Human Rights Practices: Mauritania at 7). What matters is an examination, subjectively and objectively, of Sou-mare’s situation. See Corado v. Ashcroft, 384 F.3d 945, 947 (8th Cir.2004) (per cu-riam) (a “specific, credible, immediate threat of death” on account of a protected ground can be “persecution” even if only a single incident occurs), cited in Gilaj v. Gonzales, 408 F.3d 275, 285 (6th Cir.2005) (per curiam); J.A. at 288 (Original 1-589) (“I fear physical abuse by the national police because of my past encounters with them and because I left without authorization. The authorities are still looking for me in Nouakchott (Mauritania).”) (emphasis added).
In the end, though, I would leave it to the BIA and the IJ to consider whether the government can rebut the presumption of a well-founded fear of future persecution.
Likewise, I would have remanded Sou-mare’s withholding-of-removal claims.

. Because the discrepancies are reconcilable, I agree with the majority that we should decline to grant petitioner's alternative request that we remand due to the presence of ''indis-cernibles” throughout the transcript of the hearing before the IJ. Although some of the failures in transcription occur at important moments in the hearing, the transcript shows enough for me to realize that there is no contradiction between the written statements and the hearing testimony.

. The IJ found it odd that the summons was delivered on the day that Soumare was to appear. We nor, we suspect, the IJ has any knowledge of police procedure in Mauritania. There is no reason to disbelieve the authenticity of the summons.

. The pay stub corroborates Soumare's testimony that he held a well-paying job in telecommunications. This bolsters the court's conclusion that he fled Mauritania due to persecution, not merely to seek a better economic life.