**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0576n.06

No. 10-3228

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 16, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **ALTANTSETSEG CHAGNAA; SUMIYA BEGZ** **LUVSAN**, aka Sumiya A. Luvsan, | ) | |
| | ) | |
| *Petitioners-Appellants*, | ) | **ON PETITION FOR REVIEW** |
| | ) | **OF AN ORDER OF THE** |
| v. | ) | **BOARD OF IMMIGRATION** |
| | ) | **APPEALS** |
| **ERIC H. HOLDER, JR.,** Attorney General, | ) | |
| | ) | **OPINION** |
| *Respondent-Appellee.* | ) | |

BEFORE:    COLE, ROGERS, Circuit Judges; SARGUS, District Judge[*]

**COLE, Circuit Judge.** Petitioners-Appellants Altantsetseg Chagnaa and Sumiya A. Luvsan, husband and wife, petition this court for review of the Board of Immigration Appeals' order of removal. Petitioners claim the Board erred in affirming the Immigration Judge's findings that they were not credible and that Chagnaa was not eligible for protection under the Convention Against Torture. Additionally, petitioners contend that the Immigration Judge's sua sponte questioning of petitioners at their asylum hearing violated their due process rights. For the reasons set forth below, we **DENY** the petition for review.

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Court for the Southern District of Ohio, sitting by designation.

## I.  BACKGROUND[1]

Altantsetseg Chagnaa, the lead petitioner, and her husband, Sumiya A. Luvsan ("petitioners") are natives and citizens of Mongolia who entered the United States on November 12, 2004.  On or about November 10, 2005, Chagnaa filed an application for asylum and withholding of removal under both the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT") and included Luvsan in the application.[2]  Hearings were held via video conference on May 14 and July 25, 2008; Chagnaa and Luvsan testified from Cincinnati, Ohio with their attorney present, and the Immigration Judge ("IJ") and Mongolian interpreter were located in York, Pennsylvania.

In Mongolia, Chagnaa worked as a personnel officer in the Human Resources Department of the Mongolian Ministry of Defense and was eventually promoted to the rank of Captain.  Chagnaa testified that she is a supporter of democracy, but her superiors in the Human Resources Department were communists.  These political differences form the basis of petitioners' claims.  In her role as personnel officer, Chagnaa assisted with the Ministry's process for selecting individuals to study in foreign countries at the government's expense.  Chagnaa testified that she witnessed the selection

---

[1]The facts set forth in this section are taken from petitioners' testimony.  Relevant inconsistencies are noted.

[2]Because Luvsan was included only as a derivative to Chagnaa's application and did not file a separate application, he is not eligible for withholding of removal or relief under CAT. *See Matter of A-K-*, 24 I&N Dec. 275, 279 (BIA 2007).

process unfairly favor communist applicants and that, during her tenure as personnel officer, she complained to four of her superiors about her concerns.

Chagnaa explained that she had suffered physical violence as a result of her political differences with government officials. During the evening of October 22, 2003, four individuals visited petitioners' home. Luvsan answered the door and the visitors asked to speak to Chagnaa. Chagnaa recognized one of the individuals as a friend from high school and let the four individuals into the apartment. Once inside, they began talking and the conversation turned into a disagreement over politics. The visitors demanded that Chagnaa answer questions concerning publications about illegal weapons sales. She explained that her position at the Ministry was not related to such matters and asked them to leave.[3] The visitors did not leave; they continued to press Chagnaa for answers and began to confront her physically. Luvsan told the visitors they must leave or he would call the police. The four individuals exited the apartment with Chagnaa. Once in the hallway outside the apartment, they hit Chagnaa, causing her to fall down the stairs. Chagnaa suffered a head concussion and wrist injury from the fall. Chagnaa testified that she believed communist government officials were behind the incident that night.

Additionally, Chagnaa and Luvsan have two children who still live in Mongolia. After petitioners left Mongolia, their son was stopped while driving; he was asked the whereabouts of his parents and was threatened and choked.

---

[3]However, Chagnaa explained to the IJ that she was interviewed by the authors of these articles in order to publicly expose illegal government activity.

At their hearing, the IJ asked both Chagnaa and Luvsan about their visa application process. They explained that they stated in their visa applications that they were traveling to the United States as tourists and Luvsan testified that they filed separate visa applications for their children because they were advised that whole families are unlikely to be granted visas. In a written decision, the IJ found both Chagnaa and Luvsan not credible and denied their applications for asylum, withholding of removal, and protection under CAT.

Petitioners appealed the IJ's decision to the Board of Immigration Appeals ("Board" or "BIA"). The Board did not adopt the IJ's decision, but instead issued its own opinion, finding that the IJ's credibility determination was not clearly erroneous and affirming the IJ's decision. Petitioners timely appealed.

## II. ANALYSIS

### A. Standard of Review

"Because the BIA did not summarily affirm or adopt the IJ's reasoning and provided an explanation for its decision, we review the BIA's decision as the final agency determination." *Young Hee Kwak v. Holder*, 607 F.3d 1140, 1143 (6th Cir. 2010) (internal quotation marks omitted). We review the BIA's decision, including credibility determinations, under the deferential substantial evidence standard. *Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011). Such determinations "'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)).

## B. Adverse Credibility Finding

Chagnaa filed her application for asylum in November 2005 and is therefore subject to the new standard governing credibility determinations set forth in the Real ID Act of 2005. *See Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). Under the Real ID Act, credibility determinations are made by looking at the "totality of the circumstances," and include such factors as:

> '[T]he demeanor, candor, or responsiveness of the applicant [ ], the inherent plausibility of the applicant's [ ] account, the consistency between the applicant's [ ] written or oral statements . . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record . . . , and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.'

*Khozhaynova*, 641 F.3d at 193 (alteration in original) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)); *see El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) (explaining that the Real ID Act provided a "stricter review" and abrogated the law of this circuit requiring adverse credibility requirements to be based "only on issues that went to the heart of the applicants claim" (internal quotation marks omitted)). "The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention." *El-Moussa*, 569 F.3d at 256. Although "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).

The Board based its conclusion that petitioners were not credible on several inconsistencies and omissions in Chagnaa's application. The first inconsistencies cited by the Board concern details of the October 2003 incident at petitioners' home. The Board noted that Chagnaa stated in her

written declaration that the classmate who visited her home in October 2003 was male, but testified at the hearing that the classmate was female. Additionally, Chagnaa stated in her declaration that she broke her left wrist, but at the hearing she testified that it was her right wrist.

Both at the hearing and on appeal, Chagnaa claims that the gender and wrist discrepancies are the result of translation errors. While it is possible that the translator mistakenly interpreted Chagnaa's declaration to state that her classmate was a "he" rather than a "she," it seems less likely that the translator wrote "left" when Chagnaa's declaration stated "right," or that both are mere translation errors. Adding to the unlikeliness, Chagnaa explained at the hearing that pronouns in the Mongolian language are gender specific. Moreover, Chagnaa and her attorney explained at the outset of the hearing that they went over both her original Mongolian declaration and the English translation with a translator, and Chagnaa was confident that all of the information was accurate. In this respect, this case is distinguishable from *Pergega v. Gonzales*, 417 F.3d 623 (6th Cir. 2005). In *Pergega*, we rejected the BIA's reliance on an inconsistency that the petitioner claimed to be the result of a translation error. *See id.* at 629-30. But in *Pergega*, the petitioner discovered the errors in his translated affidavit and informed the IJ and the government of the error *before* his hearing. *Id.* The government and the IJ accepted the petitioners' pre-hearing correction, but then subsequently ignored it. *Id.* Although Chagnaa argues that "[t]he translator's error can easily be verified by examining original Mongolian declaration," (Pet'r Br. 16), she neither verified it before the Board, nor provided this Court with an additional translation to verify it. Thus, both inconsistencies are proper bases supporting the BIA's adverse credibility finding.

The BIA also noted Chagnaa and Luvsan's conflicting accounts of what happened when Luvsan asked the four individuals to leave the house the night of October 22, 2003. As noted by the BIA, Chagnaa "testified that she was 'dragged' outside and hit, which caused her to fall down the stairs, [but Luvsan] stated that he held the door open while his wife and the others exited the apartment, and that they remained in the hallway outside the apartment for a 'short period of time' before his wife was assaulted." (Admin. R. ("AR") 4.) Petitioners do not assert that these statements are consistent. Rather, relying on this Court's opinion in *Koulibaly v. Mukasey*, 541 F.3d 613 (6th Cir. 2008), they contend that this inconsistency is merely "de minimis in scope or chimerical in nature" and therefore inadequate to support an adverse credibility finding. *Id.* at 622 (citing *Abbo v. Gonzales*, 150 F. App'x 524, 528 (6th Cir. 2005) (per curiam)). However, at oral argument, petitioners conceded that *Koulibaly* was decided under the prior standard, not the new "stricter" Real ID standard, *see El-Moussa*, 569 F.3d at 256, that applies to the credibility determination here. Regardless, this inconsistency is neither de minimis nor chimerical. Whether Chagnaa was physically "dragged" out of her home or her husband held the door open while his wife and her visitors exited calls into question the severity of the situation that evening and the events leading to Chagnaa's injuries.

The remaining items relied on by the BIA to affirm the IJ's adverse credibility determination concern facts provided by Chagnaa at the hearing but omitted from her written declaration. "Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum [or withholding] claim." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). But omissions can only be relied on to support an adverse

credibility finding if they contradict the testimony given before the IJ. *Id.* at 637-38; *Sinani v. Holder*, No. 09-4176, 2011 WL 1496353 (6th Cir. April 20, 2011) ("[O]missions in an application that do not directly contradict an applicant's subsequent testimony before the IJ may not form the basis of an adverse credibility finding." (citing *Liti*, 411 F.3d at 637-38)). This is because the "hearing is intended to allow an asylum seeker to elaborate on the claims made in his application." *Shkabari v. Gonzales*, 427 F.3d 324, 330 (6th Cir. 2005).

The Board found that the fact that Chagnaa failed to mention the publications regarding illegal weapons sales in her written declaration "significantly detract[ed] from her credibility." (AR 4.) However, this omission is satisfactorily explained by Chagnaa's statement in her declaration that she would "explain in full detail at the interview," (*id.* at 300), and her subsequent explanation to the IJ that she did not mention the publications about the weapons sales in her declaration because she did not have the materials to provide to the IJ at the time she submitted her written declaration, (*see id.* at 158-59). Moreover, Chagnaa's declaration provides that she and her husband were "discussing things" with the four visitors but then "got into an argument about different sides of the parties." (*Id.* at 300.) Chagnaa's testimony at the hearing about the publications therefore does not "contradict" her claims in her written statement, *see Liti*, 411 F.3d at 637-38, but rather is a proper elaboration on what "things" Chagnaa and the four individuals were discussing, *see Shkabari*, 427 F.3d at 330.

Additionally, the Board relied on Chagnaa's omission from her declaration of the fact that individuals who were looking for Chagnaa choked and threatened her son in February 2005. Although Chagnaa's written statement states that she has two children, it does not address whether

they suffered any harm in Mongolia, and therefore her subsequent testimony does not contradict her written statement. Chagnaa argues that this omission is explained by the fact that she and Luvsan did not learn of the incident until two years later—*after* submitting their written statements to the IJ. But in so arguing, Chagnaa highlights another inconsistency noted by the BIA. Although Chagnaa's testimony on this point is somewhat unclear at times, she confirmed to the IJ that she learned of this incident in February 2005, whereas Luvsan testified that they both found out in 2007. The Board noted this discrepancy and Chagnaa does not claim that the Board misinterpreted her testimony.

In sum, although the omissions cited by the BIA were insufficient to find petitioners not credible, the other inconsistencies articulated by the BIA are supported by substantial evidence in the record. Because no "reasonable adjudicator would be compelled to conclude to the contrary," *Khozhaynova*, 641 F.3d at 191, we affirm the Board's adverse credibility determination.

### C. Due Process Violation

Petitioners also claim that the IJ's sua sponte questioning "exceed[ed] the bounds of impartiality required of the IJ as a neutral finder of facts and show[ed] bias on the part of the arbiter of the law," in violation of their due process rights. (Pet'r Br. 18.) The Fifth Amendment right to due process extends to aliens in removal proceedings, which entitles them "to a full and fair hearing." *Ndrecaj v. Mukasey*, 522 F.3d 667, 673 (6th Cir. 2008) (quoting *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005)). Allegations of due process violations in immigration proceedings are reviewed de novo. *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007). "[R]eviewing an alleged due process violation is a two-step inquiry: first, whether there was a defect in the removal

proceeding; and second, whether the alien was prejudiced because of it." *Id.* (quoting *Vasha*, 410 F.3d at 872).

Petitioners in immigration proceedings "are entitled to an unbiased arbiter who has not prejudged their claims." *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005). Immigration judges are statutorily empowered to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). While immigration judges have "broad discretion in conducting their hearings," *see Ahmed*, 398 F.3d at 725, they must carefully exercise such power to ensure that their positions as neutral arbiters do not take on that of advocates. As the BIA has previously explained:

> An IJ must be impartial and must not attempt to establish proof to support the position of any party to the controversy; once he does so he becomes an advocate or a participant, thus ceasing to function as an impartial trier of fact, and a hearing so conducted is lacking in the fundamental fairness required by due process.

*Vasha*, 410 F.3d at 872-73 (quoting *Matter of Lam*, 14 I. & N. Dec. 168, 170 (B.I.A. 1972)).

Petitioners claim that the IJ violated these requirements by sua sponte questioning them about the process they undertook to obtain nonimmigrant tourist visas. In its decision, the Board agreed with petitioners that "the Immigration Judge should not have relied on the statements [petitioners] made to consulate officials in order to obtain visas to flee the country," but rejected petitioners claim that the IJ was biased or prejudiced. (AR 5 n.5.) We agree with the Board that the IJ should not have relied on petitioners' statements related to their visa application process. The process by which individuals fleeing persecution enter this country seeking refuge should not later be used against them in their asylum proceedings. *See Rai v. INS*, 72 F. App'x 615, 616 (9th Cir. 2003) (explaining

that an alien's use of false documents to obtain initial entry in order to flee persecution "does not detract from his credibility," but rather "can actually evidence a subjective fear of returning to his own country").

Petitioners also contend that the IJ's lengthy cross-examination of Luvsan and the overall tone and demeanor of the IJ's questions rendered him an advocate. Whether the IJ's questioning of petitioners in this case crossed the line to that of an advocate is a close question. But we need not decide whether this constituted a defect in the removal proceeding because petitioners have failed to establish prejudice.

A due process violation in removal proceedings results in prejudice where "the IJ's conduct potentially affected the outcome of the proceedings." *Vasha*, 410 F.3d at 875 (quoting *Cano-Merida v. INS*, 311 F.3d 960, 965 (9th Cir. 2002)). However, the Board did not adopt the IJ's decision, instead issuing its own opinion analyzing petitioners' claim. In doing so the Board did not rely on any portion of petitioners' testimony regarding their visa application process. Rather, the Board detailed several inconsistencies in finding petitioners not credible. As discussed above, substantial evidence supports this determination and therefore the IJ's questions did not prejudice petitioners. *See Vasha*, 410 F.3d at 875; *see also Castellano-Chacon v. INS*, 341 F.3d 533, 553 (6th Cir. 2003) (holding failure to allow petitioners opportunity to make opening and closing statements constituted error but denying petitioner's due process claim because petitioner "failed to identify any specific prejudice").

Accordingly, petitioners have failed to show the hearing they received violated their due process rights.

**D. CAT Protection**

Lastly, Chagnaa claims the physical assault she suffered constitutes torture entitling her to withholding of removal under CAT. Under CAT, an individual may not be deported if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is "an extreme form of cruel and inhuman treatment," 8 C.F.R. § 1208.18(a)(2), and is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" for several reasons, including punishment, intimidation or coercion, "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* § 1208.18(a)(1). The Board concluded that Chagnaa had not established eligibility for protection under CAT because "[t]he record does not contain independent evidence that would support [her] CAT claim when considered without regard to her testimony that was properly found not credible." (AR 5.) Chagnaa neither contests this finding by the Board, nor presents any additional evidence to support her claim. Thus, the BIA's decision to deny her CAT claim is supported by substantial evidence.

## V. CONCLUSION

For the reasons set forth above, we **DENY** Chagnaa's petition for review and **AFFIRM** the Board's decision.