RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KASSEM HACHEM; HIAM SEHEIM; MOHAMAD
HACHEM; HUSSEIN HACHEM (09-3992),

        *Petitioners,*

MOHAMED ALLALEN (09-4453),

        *Petitioner,*

   *v.*

ERIC H. HOLDER, JR., United States Attorney
General,

        *Respondent.*

Nos. 09-3992/4453

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A079 334 470; A079 334 471; A079 334 472;
A079 334 473; A099 776 794.

Decided and Filed: August 29, 2011

Before: BATCHELDER, Chief Judge; SUTTON and McKEAGUE, Circuit Judges.

———————————

## COUNSEL

———————————

**ON BRIEF:** Robert M. Birach, LAW OFFICE OF ROBERT M. BIRACH, Detroit,
Michigan, Brian C. DiFranco, DiFRANCO LAW OFFICE, Columbus, Ohio, for
Petitioners. Melody K. Eaton, Andrew N. O'Malley, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————————

## OPINION

———————————

ALICE M. BATCHELDER, Chief Judge. Mohamed Allalen, a native and citizen
of Algeria, petitions for review of a Board of Immigration Appeals ("BIA") order that
affirmed an Immigration Judge's ("IJ") decision denying his application for asylum,

withholding of removal, and protection under the Convention Against Torture ("CAT"). Kassem Hachem and his family, natives and citizens of Lebanon, petition this court for review of a BIA order that affirmed the IJ's decision denying withholding of removal and CAT protection. The IJs and BIA granted both Allalen and Hachem voluntary departure. They have made motions before this court for a stay of voluntary departure. The cases were combined because of that issue. We deny their petitions and deny their motions.

We will address separately each petition for review before addressing the motions for stay of voluntary departure.

## I.  ALLALEN

### A.  Facts and Procedural History

On his application for asylum, withholding of removal, and relief under the CAT, Allalen stated that he is afraid to return to Algeria because he had been harassed and beaten by Arabs and Muslim extremists on account of his Berber ethnicity. Allalen was born in Algeria to Berber parents. Allalen is a Muslim, but is not practicing. During high school he had a girlfriend, which he claims did not go over well with some of the more devout Muslims, who disapprove of open fraternization between the sexes. Allalen claims that in February 2004 he was twice approached and threatened by two men outside his high school. The second time, he claims, one of the individuals threatening him brandished a knife. Allalen claims that, both times, he was told that he needed to stop openly dating his girlfriend, who was also Berber.

Allalen claims that he reported the threats to the police, but that they did nothing about it. He says that if the police had investigated, they would have approached him again and let him know what had been done, because that is how things work in Algeria. He did not provide copies of police reports and he admitted that he had never asked for them.

Allalen did not stop seeing his girlfriend and he claims that in February 2005 he was again approached and threatened by the same two men. This time, they shoved him

into a corner and kicked him. He also claims that they again brandished a knife. Although he claims that he and his girlfriend were scared and that, as a result, they only continued their relationship in secret, he never reported the incident to the police. Allalen claims that he is still in contact with his girlfriend, and that she has stated that if he comes home he will be killed, but he has provided no written statement from her to corroborate his claims.

Later that year, in November 2005, Allalen claims that he received a phone call at his home from two people threatening to kill him. He claims that he recognized the voices of the two men who had threatened him before. His mother allegedly reported the incident to the police, but when asked whether anyone followed up on the report, Allalen said that the police would have contacted him, so he knew they didn't do anything.

Allalen provided no written statement from his mother to corroborate his story. He admitted that while his mother did not know how to write, others in his mother's household knew how to write and could have provided a statement, but that he didn't know that he needed one.

Allalen submitted a number of other documents, including: a U.S. Department of State Travel Warning, advising of the danger to U.S. citizens in Algeria; a report on the dangers faced by Berbers in Algeria; an article about Al-Qaeda in Algeria; and an article about Algerian border guards killing someone. The government submitted the Department of State's 2007 Country Report for Algeria; an October 2007 Background Note on Algeria prepared by the Department of State's Bureau of Near Eastern Affairs; and the Department of State's 2007 International Religious Freedom Report for Algeria.

After the hearing, the IJ issued an oral decision in which he denied the application for all forms of relief because: (1) Allalen was not a credible witness, (2) he had not established past persecution in Algeria necessary for entitlement to asylum relief, (3) he had failed to show that he had a well-founded fear of persecution should he be removed to Algeria, (4) he could not meet the higher burden for withholding of removal since he had not met his burden for eligibility for asylum, and (5) he had not met his

burden of demonstrating that it is more likely than not he would be subjected to torture if he returned to Algeria, as required for relief under the CAT.

On appeal, the BIA generally adopted the IJ's findings of fact and conclusions of law, noting the guidelines for determining credibility as set forth in the REAL ID Act of 2005, and finding no clear error in the IJ's adverse credibility determination. The BIA agreed that, even accepting as credible Allalen's testimony, Allalen had failed to show that the incidents he experienced equated to past persecution, or that he had a well-founded fear of persecution based on those incidents. The BIA rejected Allalen's argument that the IJ's questioning, tone, or comments denied him a fair hearing and due process. Lastly, the BIA affirmed the denial of withholding of removal and relief under the CAT.

Allalen petitioned this court for review of the denial of asylum. He has failed to challenge, on appeal, the IJ's and the BIA's determinations that he was not entitled to withholding of removal or relief under the CAT. Therefore, these grounds for relief have been abandoned and we will not address them. *Patel v. Gonzales*, 470 F.3d 216, 219 (6th Cir. 2006).

## B.  Jurisdiction and Standard of Review

We have jurisdiction over the petitioner's request for asylum pursuant to 8 U.S.C.§ 1252(a)(1). This court has jurisdiction to review the final decision of the BIA "affirming the IJ's denial of asylum." *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005). Generally, this court reviews the BIA's decision to determine whether it is supported by substantial evidence. *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). Where the Board adopts the IJ's decision and supplements that decision with its own comments, as in this case, we review both the BIA's and the IJ's opinions. *See Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (per curiam).

An IJ's credibility determinations are considered findings of fact and are reviewed under the substantial evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). We will reverse a credibility determination only if any reasonable

adjudicator would be compelled to conclude to the contrary. *Pergega v. Gonzales*, 417 F.3d 623, 627 (6th Cir. 2005).

**C.  Analysis**

In support of his petition for review, Allalen argues that the IJ's adverse credibility finding was contrary to the REAL ID Act, that the IJ "incorrectly applied the well-founded fear standard" when he determined that Allalen was not entitled to asylum relief, and that his due process rights were violated when the IJ allegedly treated him in an "antagonistic, derogatory manner" during the course of the hearing.

Under the REAL ID Act, credibility determinations are based on the "totality of the circumstances" and should take into account "all relevant factors."  These factors include

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii); *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009).

The IJ considered the totality of the circumstances and provided the reasons for his findings.  Specifically, he noted the brevity of Allalen's statements in his application and at the hearing, the lack of detail about his experiences in Algeria, Allalen's overall demeanor on the witness stand, and the implausibility of his stories.  The IJ found it difficult to believe that Allalen could recognize the two men's voices over the phone in November 2005, eight months after Allalen's last encounter with them, especially when Allalen had seen these two men only briefly, and only on two occasions over a period of two years.  The IJ also stated that Allalen had failed to provide any corroborating

statements from his girlfriend, his mother, or his father, notwithstanding his testimony that all of these individuals had first-hand knowledge of the threats and the phone call. Moreover, this evidence was reasonably available in light of Allalen's testimony that he had regular contact with his family members and his girlfriend. The BIA reiterated the IJ's findings, and concluded that the IJ had considered the "totality of the circumstances" as required by the REAL ID Act before making an adverse credibility determination.

We will not reverse the IJ's finding as to the availability of this corroborating evidence because we do not find that a reasonable trier of fact would be compelled to conclude that such evidence was unavailable. *See* 8 U.S.C. § 1252(b)(4). Moreover, the IJ and the BIA provided the reasons for this determination, using the factors set forth in § 1158(b)(1)(B)(iii), and it was reasonable for the IJ to expect corroborative evidence to support Allalen's testimony, *see Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004).

Substantial evidence supports the Board's finding that the IJ's comments and questioning at the hearing did not prejudice Allalen or deny him due process. Allalen correctly argues that he was entitled to the Fifth Amendment guarantee of a full and fair hearing. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 673 (6th Cir. 2008). Allalen "must establish both error and substantial prejudice to prevail on a due process challenge." *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007) (quotation marks omitted). To "trigger due process concerns," any error "must have been such as might have led to a denial of justice." *Id.* (quotation marks omitted).

Allalen argues that the IJ's "tone and temperament" during the hearing proved that the IJ was not impartial, but was "assuming the role of prosecutor." However, a review of the transcript belies this allegation. The IJ interrupted questioning by the attorneys only to clarify Allalen's answers or to obtain further information related to the facts already being elicited. Even if Allalen perceived the IJ's line of questioning as intimidating, the limited interruption and perceived intimidation did not render the hearing unfair. *See Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005). The IJ did not repeatedly address Allalen in an "argumentative, sarcastic, and sometimes arguably

insulting manner that went beyond fact-finding," or create the appearance of unfairness to the point where Allalen's answers may have been unreliable. *See Elias v. Gonzales*, 490 F.3d 444, 451 (6th Cir. 2007) (per curiam). The IJ did make one arguably sarcastic comment that the two alleged aggressors must be "like groundhogs" because they always showed up in February, but this isolated remark was not enough to show that the IJ was biased such that Allalen's due process rights were violated. *See Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir. 1996), *superseded by statute on other grounds as stated in Visha v. INS*, 51 F. App'x 547, 551 (6th Cir. 2002).

Because Allalen was found not credible, he failed to present adequate and credible evidence that he was subject to persecution or has a well-founded fear of future persecution so that he may be entitled to asylum relief. *See* 8 U.S.C. § 1101(a)(42)(A); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004).

## II.  HACHEM

### A.  Facts & Procedural History

Hachem, his wife Hiam Seheim, and their children Mohamad and Hussein Hachem ("the Hachems"), are natives and citizens of Lebanon. Hachem claims that he has suffered past persecution for his political opinions. Hachem is not a member of any minority group, and does not belong to any political party, but is opposed to Syria's interference in Lebanon. Prior to coming to the U.S., Hachem drove a truck, transporting goods. He testified that, in driving his regular route, he was often stopped at checkpoints by Syrian officers and asked about his political affiliation. According to Hachem, each day when he arrived at the checkpoints, he was stopped, searched, and sometimes investigated and delayed two to three hours. Other than inconvenience, however, Hachem never experienced any harassment or persecution prior to May 1999.

In April 1999, Hachem participated in a demonstration against Syrian involvement in Lebanon. While many at the demonstration were arrested, Hachem was

not one of them. Nevertheless, he feared for his safety and stayed for a time at his in-laws' house in a different area of the country.

In May 1999, after returning to work, Hachem was again stopped by Syrian officers at a security checkpoint. This time, he was not as lucky as before, and he was detained for over a week. He testified that the officers questioned him about what political party he belonged to, whether he supported the Syrian presence in Lebanon, and whether he had demonstrated against Syria. He also testified that they accused him of being a spy. When he didn't admit to anything, the officers beat him with their hands and feet. This continued every day for the week that he was held. He was released after he signed an agreement that he would not oppose Syrian influence in Lebanon. He was told that he would be watched. Hachem and his wife both testified that he emerged from this detention badly shaken mentally, and badly bruised physically. However, Hachem testified that none of his injuries were serious, and that he did not seek medical attention. The only people to whom he reported this incident were his family members. He testified that he did not obtain affidavits from his family because those in Lebanon were too afraid to write,[1] and those elsewhere were not in Lebanon when the events occurred.

Hachem again went into hiding at his in-laws' house, and through their connections, he made multiple trips to Cyprus in order to obtain tourist visas for himself and his family. Hachem entered the U.S. from Ireland on September 14, 1999, with permission to remain until March 12, 2000, while the rest of his family had entered through Detroit on July 6, 1999, with permission to remain until July 7, 2000. They overstayed their visas and removal proceedings were initiated on October 17, 2002.[2] The Hachems sought relief in the form of withholding of removal and CAT protection.[3] They admitted the factual allegations against them and conceded removability.

---

[1]Hachem's wife, however, testified that she is in constant contact with her parents because the situation in Lebanon is so unstable.

[2]Of note, Hachem's parents are U.S. citizens, as are two of his other children, who were born in the United States after Hachem and his family overstayed their visas.

[3]Hachem's application included his wife and children, who did not file independent applications for withholding of removal.

Hachem's wife stated that she was afraid to return to Lebanon because she fears for her husband, because of past experiences, and because she fears for her family due to bombings. Hachem testified that he feared additional arbitrary detention and more physical and emotional abuse by Syrian intelligence officers if he returned.

Despite finding Hachem and his wife to be credible, the IJ presiding over the removal proceedings denied the Hachems' application for withholding of removal and CAT protection, but granted their request for voluntary departure. The Hachems appealed to the BIA, but only challenged the denial of their application for withholding of removal. The BIA dismissed the appeal, concluding that the record compels a conclusion that Hachem had failed to establish either past persecution or that his life or freedom would be threatened because of his political opinion if he returned to Lebanon.

**B. Standard of Review**

Where, as here, the BIA issued a separate opinion, rather than summarily affirming the IJ's decision, we "review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, [we] also review[] the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal citation omitted).

**C. Analysis**

In the instant petition for review, the Hachems argue that substantial evidence supported that Hachem had in fact suffered past persecution and that country conditions did not change so as to obviate their fears of future persecution.

"Withholding of removal . . . is mandatory if the alien establishes that his 'life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id*. (quoting 8 U.S.C. § 1231(b)(3)(A)). The applicant, however, "must demonstrate that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Id*. at 436 (internal quotation marks omitted). If the applicant establishes past persecution, then "the burden of proof shifts to the government to prove

that such a 'fundamental change in circumstances' has taken place in the country of removal such that the [applicant's] life or freedom is no longer in danger." *Thap v. Mukasey*, 544 F.3d 674, 681 (6th Cir. 2008) (quoting 8 C.F.R. § 208.16(b)(1)(A)). The applicant must "actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable." *Id.* (internal quotation marks omitted).

Upon review, we find that any reasonable fear of persecution that Hachem may have had upon returning to Lebanon has been negated by changed country conditions. In her oral decision and order, dated October 16, 2007, the IJ relied heavily on a 2006 Country Report to determine that country conditions had changed to such an extent that Hachem no longer had a reasonable fear of persecution in Lebanon. We agree and find that no reasonable adjudicator would be compelled to conclude to the contrary. *Khalili*, 557 F.3d at 435.

The record shows that the Syrian military withdrew their forces from Lebanon in April 2005; the Lebanese government has taken "significant steps to increase freedom of assembly and association at mass demonstrations and by facilitating the formation of new political associations and parties"; "[t]here were no reports of politically motivated disappearances caused by government forces"; the only security checkpoints maintained by the government are primarily in military and other restricted areas, and there are few police checkpoints on main roads or populated areas used to search for smuggled goods, weapons, drugs, and subversive literature; and in May and June 2005, parliamentary elections were held without Syrian interference. The Hachems' arguments on appeal concerning the changed country conditions are unpersuasive.

Accordingly, we deny the Hachems' petition for review and affirm the BIA's order of removal.

### III.  MOTIONS TO STAY VOLUNTARY DEPARTURE

We now turn to the petitioners' motions for stay of voluntary departure.  This is the first time this circuit has addressed such an issue since the Attorney General promulgated a new regulation.  Effective January 20, 2009, that regulation states, in relevant part, "[A]ny grant of voluntary departure shall terminate automatically upon the filing of the petition or other judicial challenge."  8 C.F.R. § 1240.26(i).  Prior to the promulgation of this regulation, there was a circuit split on the issue of whether or not a court of appeals had the discretion to stay voluntary departure.  *Compare Ngarurih v. Ashcroft*, 371 F.3d 182, 194 (4th Cir. 2004) (cannot stay order), *with Desta v. Ashcroft*, 365 F.3d 741, 743 (9th Cir. 2004) (can stay order), *and Nwakanma v. Ashcroft*, 352 F.3d 325, 327 (6th Cir. 2003) (per curiam) (can stay order).  The new regulation resolved that issue.  While the petitioners did not challenge the validity of the regulation, we will address that issue because it is a matter of first impression in this court.[4]

Our review of the regulation is limited to constitutional claims or questions of law.  *See Patel v. Attorney General*, 619 F.3d 230, 234 (3d Cir. 2010) (citing 8 U.S.C. § 1229c(e); *id.* § 1252(a)(2)).  One such question of law is whether or not the regulation conflicts with the enabling statute.  Under the familiar *Chevron* two-step analysis, we first look at the statute upon which the regulation is based.  If "Congress has directly spoken to the precise question at issue," then that is the end of the inquiry.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  The unambiguously expressed intent of Congress controls.  *Id.*  However, "if the statute is silent or ambiguous with respect to the specific issue," we must decide "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

Here, Congress has not spoken directly to the issue of whether an alien's petition for review may automatically terminate an order of voluntary departure.  What Congress

---

[4]Our sister circuits have addressed the regulation in question, finding that the grant of voluntary departure does indeed terminate automatically upon petition for judicial review.  *See Patel v. Attorney General*, 619 F.3d 230, 234 (3d Cir. 2010); *Hakim v. Holder*, 611 F.3d 73, 78 (1st Cir. 2010); *Sanchez-Velasco v. Holder*, 593 F.3d 733, 737 (8th Cir. 2010).  None of those cases squarely addressed the validity of the regulation itself.

has spoken on unambiguously is that the Attorney General has the discretion to grant voluntary departure. 8 U.S.C. § 1229c(b)(1) ("The Attorney General may permit an alien voluntarily to depart the United States . . . ."). Congress has also unambiguously stated that the Attorney General may promulgate regulations to limit the eligibility for voluntary departure. *Id.* § 1229c(e) ("The Attorney General may by regulation limit eligibility for voluntary departure under this section . . . .").

Under the next step of *Chevron*, it is clear that the Attorney General has promulgated a regulation under a permissible construction of the statute. The statute makes clear that the grant of voluntarily departure is a discretionary matter. No alien is automatically entitled to such a grant. The Attorney General has reasonably created rules by which this discretion should be governed, just as the statute empowered him to do. We have no trouble finding valid the regulation promulgated by the Attorney General.

We also find that the regulation is a constitutional delegation of rulemaking authority and does not violate the principle of separation of powers. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). So long as Congress sets forth an "intelligible principle" to guide rulemaking, the delegation is valid. *Id.* at 372. The cases where Congress violates the nondelegation principle are few and far between. *See, e.g.*, *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 474 (2001) ("In the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes . . . ."). In this case, "Congress expressly authorized the Attorney General to exercise his discretion to determine who may be permitted to voluntarily depart, and sufficiently delineated the field within which the Attorney General is to exercise that discretion." *United States v. Ramirez-Lopez*, 251 F. App'x 390, 391 (9th Cir. 2007).

Having found that the regulation is indeed valid, we now address whether or not the regulation applies to the Petitioners. The BIA entered the order granting voluntary departure for Allalen on November 9, 2009, and for Hachem on July 20, 2009. Both

were granted sixty days to voluntarily depart, but warned that filing a petition for review with this court would result in immediate termination of the grant of voluntary departure. Section 1240.26(i) became effective on January 20, 2009.  *See* 73 Fed. Reg. 76927, 76927 (Dec. 18, 2008); *id.* at 76936 ("An alien who receives a decision by the Board reinstating voluntary departure on or after the day of the effective date of this rule will be subject to the automatic termination rule if that alien decides to seek judicial review . . . .").  The automatic termination rule clearly applies to both Allalen and Hachem.

Hachem argues that the regulation does not apply to him since the IJ granted voluntary departure to him in 2007, before the effective date of the regulation, and that "the Board . . . did not issue an order of voluntary departure but simply extended the period of time during which the Respondents were allowed to depart, as a matter of discretion."  His argument fails.  The BIA reinstated voluntary departure in its July 20, 2009 order—it did not grant an "extension."  *See* Hachem Administrative Record 4 ("[T]he respondents are permitted to voluntarily depart the United States, without expense to the Government, within 60 days from the date of this order.").  Besides, the BIA has no discretion to "extend" an order of voluntary departure.  Only the district director for the Department of Homeland Security, the Deputy Executive Associate Commissioner for Detention and Removal, or the Director of the Office of Juvenile Affairs have the authority to extend the time of voluntary departure granted by an IJ or the BIA.  8 C.F.R. § 1240.26(f); *see also Lopez v. Mukasey*, 313 F. App'x 96, 102 (10th Cir. 2008) ("With respect to [Petitioner]'s motion to extend the time for voluntary departure, the BIA did not err in failing to rule on the motion because it lacked the authority to do so.").  Hachem offers no authority to the contrary.

## IV.  CONCLUSION

For the foregoing reasons we **DENY** the petitions for review and **DENY** the motions for stay of voluntary departure.