NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1271n.06

Case Nos. 11-4208

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Dec 11, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SARATA FALL KABA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE BOARD OF |
| ERIC H. HOLDER, JR., Attorney General, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before: BATCHELDER, Chief Circuit Judge; DAUGHTREY and ROGERS, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. Sarata Kaba, a native and citizen of Guinea, petitions for review of an order from the Board of Immigration Appeals (BIA) dismissing her appeal of an Immigration Judge's (IJ's) denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We DENY her petition.

I.

Sarata Kaba entered the United States on May 29, 2005, at New York City, on a non-immigrant visitor visa. She overstayed the visa and, on May 30, 2006, filed an asylum application. She claimed that she had been subjected to female genital mutilation (FGM) at "an early age" and that her parents or husband would subject her to a second FGM if she returned to Guinea.

In her hand-written application, Kaba claimed that, in February 2005 — when she was 20 years old — her father had arranged for her to marry a 60-year-old, wealthy business colleague, in exchange for money and property. On April 5, 2005, the day before the wedding, she ran away to

a nearby village where she stayed for two days with a family that took her in. The police found her and, at the request of her parents, arrested her, beat her, and returned her to her parents' home. The wedding was held on April 11, 2005, and on the wedding night her husband discovered that she was not a virgin and demanded return of his money and property. Because her parents could not repay the money, they offered to instead have Kaba undergo another FGM and scheduled it for April 27, 2005. She ran away again, this time to her boyfriend's aunt, who assisted her in getting a visa to the United States. She left Guinea on May 28, 2005, and arrived in the United States on May 29, 2005.

An asylum officer interviewed Kaba on July 13, 2006. Kaba recounted the foregoing story, but the officer noted that, according to her passport, she had left Guinea and arrived in Dakar, Senegal, on February 14, 2005, and then returned to Guinea from Senegal on May 9, 2005 (prior to leaving Guinea for the United States on May 28, 2005). When he questioned Kaba about the passport stamps, she "acknowledged that she had, indeed, left Guinea on February 14, 2005, and returned to Guinea on May 9, 2005." Based on the time stamps, he found Kaba's story implausible and her testimony not credible. He found her ineligible for asylum and referred her to an IJ.

Kaba appeared before an IJ, conceded removability, and renewed her applications for asylum, withholding, and protection under the CAT. At a hearing on June 10, 2009, she recounted her story, with some notable discrepancies. For example, she said the FGM happened when she was five years old, whereas she had previously said she was ten; she claimed the police took her to her would-be husband, whereas she had previously said that they took her to her parents; she claimed that she had run away the day *after* her wedding ceremony, whereas she had previously said the day *before*. She

blamed the discrepancies on her inability to speak English and her reliance on the interpreter and lawyer.

The government submitted a complete copy of Kaba's Guinean passport, issued on January 23, 2004. In addition to the stamps documenting the trip to Senegal in 2005, the passport revealed two visas for temporary travel to the United States: one for August 18, 2004 (apparently unused) and the other for May 9, 2005 (the trip at issue). Both required that she be accompanied by one "Hadja Saran Koma." Kaba claimed that she had misplaced her actual passport and could not produce it, but agreed that the copies produced by the government were accurate depictions of her passport. She acknowledged that an additional visa had been issued to her on August 18, 2004, for travel to the United States, but could not elaborate. When asked about the trip to Senegal from February 14 to May 9, 2005, she denied having gone to Senegal and claimed that her boyfriend's aunt — who had obtained the passport for her — had arranged for those stamps to be entered in her passport. She testified that the asylum officer had asked her about traveling to Senegal and the stamps, but she did not recall admitting to him that she had been in Senegal during the time period indicated.

Kaba conceded that she never tried to get corroborating statements from Hadja Saran Koma, the woman with whom she had traveled to the United States, or statements from either her boyfriend or her boyfriend's aunt. She also conceded that she did not seek asylum at her layover in France, on the way to the United States, or immediately upon arrival in the United States in May 2005.

The IJ questioned Kaba regarding why she had not submitted medical evidence to confirm that she had undergone FGM as a child. She answered that she had undergone a medical examination two weeks earlier, but the document was "not detailed enough," so she had returned to

3

the doctor the day before the hearing. When asked why she had waited over three years to get this documentation, she said it was too difficult because she did not have a car. In response to this questioning, Kaba's attorney subsequently submitted a handwritten note on a prescription form, asserting that an examination revealed conditions "consistent with Type I female circumcision." Notably, the short handwritten form refers to her as both "Sarata Kaba" and "Sarata Goba."

The IJ denied her applications for asylum, withholding of removal, and protection under the CAT. The IJ determined that Kaba was not credible, based on the inconsistencies between her application and her testimony, and her inability to explain those inconsistencies. The IJ found that her proffered medical evidence did not prove prior FGM, as the handwritten note on the prescription form was unusual and did not verify her identity or indicate that any identification was used by the doctor to verify her identity. And the IJ found compelling the passport stamps indicating that she was in Senegal rather than Guinea during the time she claimed to have been married, arrested, beaten, and threatened by her parents.

Kaba appealed to the BIA, arguing that the IJ's adverse credibility determination was not supported by substantial evidence in the record and that the objective evidence established that there was a "pattern or practice" of harm against women in Guinea with respect to FGM. The BIA found no clear error in the IJ's adverse credibility determination and held that the IJ had properly considered the totality of the circumstances in finding Kaba not credible. The BIA affirmed the IJ's holding that Kaba had failed to provide reasonably available corroborating evidence. And the BIA determined that the objective evidence did not establish that there was a "pattern or practice" of harm against women in Guinea with respect to FGM. The BIA dismissed her appeal.

4

## II.

The BIA affirmed the IJ's decision in a separate opinion, and in so doing, adopted some of the IJ's reasoning. We review the BIA's decision when the BIA issues a separate opinion. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, . . . [we] also review[] the immigration judge's decision." *Id*.

Kaba raises two issues on appeal, claiming (1) the adverse-credibility determination was incorrect based on the totality of the circumstances, and (2) her "pattern and practice" argument was sufficient by itself to prove a legitimate fear of future persecution. We consider each.

## A.

We review credibility determinations under the substantial-evidence standard and will reverse only when the evidence *compels* a contrary conclusion. *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011). "Under the REAL ID Act, credibility determinations are based on the 'totality of the circumstances' and take into account 'all relevant factors.'" *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The IJ may base an adverse credibility determination on, among other things, "the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made)," regardless of whether an inconsistency "goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii) (providing the credibility standard for an asylum proceeding). "The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the

5

torture convention." *El-Moussa*, 569 F.3d at 256 (citing 8 U.S.C. § 1229a(c)(4)(C), which provides the credibility standard for removal proceedings identical to § 1158(b)(1)(B)(iii)).

Kaba contends that the adverse-credibility determination was based on "minor discrepancies" and "tangential matters," and that the "totality of the circumstances" provides "substantial evidence" that she was actually credible. Apt. Br. at 12-13. A careful review of the record, the IJ's opinion, the BIA's opinion, and the controlling law reveals that Kaba misstates or misunderstands the standard and has mischaracterized the IJ's and BIA's credibility assessment. Moreover, she has wholly ignored the single most important discrepancy, which is that her story (i.e., she was married, arrested, beaten, and threatened by her parents *in Guinea* in April 2005) is irreconcilable with her passport (i.e., she was *in Senegal* in April 2005). We are presented with two possible explanations.

The first possibility — accepted by the IJ and the BIA — is that the passport is true and reliable and, therefore, Kaba's conflicting story must be false. The likelihood of this possibility was bolstered by the apparent authenticity of the passport and stamps (in the copies), her inability to produce her actual passport for closer scrutiny, and the asylum officer's notes asserting that she had admitted to having been in Senegal in April 2005 as the passport depicted (though she later denied having made that admission). If, as the IJ and the BIA determined, this story is false, the IJ and BIA had sufficient reason to find Kaba not credible (and the record contains additional discrepancies as well).

The second possibility — insinuated by Kaba — is that the story is true and the stamps on the passport are false (forged). Kaba implies this, asserting that her boyfriend's aunt obtained the passport for her and that she had no knowledge of the stamps or how they got into the passport, but

never asserts directly or offers any proof that the stamps on the passport are forgeries. To be sure, if these stamps are forgeries, they are good ones. This passport and these stamps fooled the agents at her departure from Guinea, at her layover in France, and at her arrival in New York, the asylum agent at her initial interview, and everyone since. The record does not contain substantial evidence that would compel a finding that Kaba's passport stamps are forgeries and, therefore, this argument standing alone does not compel a finding that Kaba is credible.

Based on this significant discrepancy, as well as several others, the IJ and the BIA concluded that Kaba was not credible. We find that substantial evidence in the record does not compel a contrary conclusion. *See Hachem*, 656 F.3d at 434. Kaba's argument is without merit.

**B.**

A petitioner seeking withholding of removal must demonstrate a well-founded fear of future persecution. We review factual findings, including whether a petitioner has made that showing, under the substantial-evidence standard and will reverse only when the evidence *compels* a contrary conclusion. *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006). A petitioner can base a well-founded fear of future persecution on either a likelihood of harm specifically targeted at her or on a "pattern or practice" of persecution targeted at others similarly situated. *Gomez-Romero v. Holder*, 475 F. App'x 621, 625 (6th Cir. 2012) (citing 8 C.F.R. § 208.13(b)(2)(iii); *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005)).

Kaba's attorney contends that she can show a well-founded fear of future persecution based on a "pattern or practice" of FGM in Guinea, and relies on a State Department Report, declaring a 96% FGM rate in girls between the ages of four and 17. Apt. Br. at 7. But Kaba is not a girl

between the ages of four and 17, and she is not claiming — nor has she ever claimed — a general fear of FGM solely on the basis that she is a girl. Kaba is a 27-year-old woman who claims, by her own unverified account, that she has already been subjected to FGM once and fears that her parents and husband will subject her to FGM again because she was not a virgin at the time of her wedding.

Kaba's claim is that she was specifically targeted for FGM for a specific reason. But Kaba is not credible — as demonstrated in the foregoing section — and she has offered no corroborating evidence. Even her claim of past persecution (FGM), though supported by the pattern-or-practice evidence in the State Department Report, is undermined by her inability or unwillingness to provide legitimate medical proof.

Based on Kaba's claims and the State Department Report, the IJ and the BIA concluded that Kaba had not shown a well-founded fear of persecution. No evidence in the record compels a contrary conclusion. *See Lumaj*, 462 F.3d at 577. This argument is without merit.

**III.**

Based on the foregoing, we **DENY** the petition for review.