**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  14a0277n.06

Case No. 13-3801

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 14, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EDGAR MASIKO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| ERIC H. HOLDER, JR., Attorney General, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

BEFORE:  SUHRHEINRICH, ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.  Edgar Masiko claims the Board of Immigration Appeals erred when it denied his applications for asylum, withholding of removal and protection under the Convention Against Torture.  Ample evidence, however, supported the Board's finding that Masiko did not present a credible case.  We thus must deny his petition for review.

I.

Masiko alleges that he fled his home country of Uganda in 2009 to escape persecution on account of his sexual orientation.  Here is the story Masiko initially presented to the immigration authorities:  Masiko knew he was gay from a young age, and he met his first boyfriend James at a gay club in 2000.  By happenstance, the two lived nearby and soon became roommates at

King's College, where they both attended high school. They managed to keep their relationship a secret for a time, but shortly before final exams in the winter of 2002, a student cleaning crew caught them kissing in the same bed in their dorm room. School officials beat both boys and expelled them, and Masiko's parents disowned him.

Masiko went to live with his older sister to finish high school. He then moved closer to Makerere University where he began a bachelor's degree program in August 2003. At Makerere University, Masiko met and began dating Timothy. Things went smoothly until 2006, when Ugandan police arrested the couple after they left a gay club. For two days, the police beat the men, questioned them about their sexual orientation and accused them of corrupting and sodomizing other young people. Masiko and Timothy escaped death only because they had university identification cards, which would have made their disappearances difficult to hide.

Masiko's problems escalated after his arrest, including a car chase with the police in 2006 and police visits to his workplace in 2008. Shortly thereafter, in early 2009, two security officers and three other men ambushed Masiko as he got out of a taxi near his home in the middle of the night. Fearing for his life, Masiko ran screaming through nearby fields as the operatives fired their guns and threatened to shoot him. Masiko called in sick to work and hid in his home for the next three days. When he finally returned, his employer forced him to resign because the Ugandan Internal Security Organization had identified him as a gay man.

In response, Masiko and other members of the Uganda Gay Association organized a peaceful demonstration in support of gay rights. Thirty minutes after it began, Internal Security officers intercepted the demonstrators, spraying them with tear gas and shooting them with real and rubber bullets. Masiko narrowly escaped. When he finally returned home, he learned that

news footage of the raid had exposed him as a gay demonstrator. Masiko's landlord evicted him, and Masiko hid in another town until he got a student visa and fled to the United States.

The problem for Masiko is that he did not stand by this version of events as the immigration hearing unfolded. When it came time to answer questions and to present corroborating evidence, Masiko started to tell different stories. As he filled in details about the events that he claims transpired—big and small, from who he was to what happened to where it occurred—his initial narrative fell apart.

Things began to unravel when Masiko tried to prove he was who he said he was. Masiko presented a birth certificate to the immigration court to confirm his identity. Yet this Ugandan birth certificate for a 1982 birth came in a package from the United Kingdom and indicated that the birth had been registered on July 28, 2010 (just one day before the certificate was issued and three days before his asylum application was filed) by Masiko's father (who supposedly had disowned him eight years earlier). Masiko brought his passport too, but this did not help. When asked, Masiko claimed that it was his first passport because he "didn't really need" one until he left for the United States. AR 309. He also explained that he got it without a birth certificate— recall, his birth had not yet been registered when he left Uganda—by showing his identification card from Warid Telecom, his employer. The passport refuted both statements. It indicated that Masiko had a prior passport and it listed his occupation as a student, not as an employee of Warid Telecom. Faced with these discrepancies, Masiko changed his story. No, it was not his first passport; his parents had gotten him one before. No, he did not use his work identification to *obtain* a passport; he used it only to *claim* his new passport after his sister sent in the old one for renewal.

The struggles continued as Masiko fielded questions about his family. When the immigration judge asked Masiko how many brothers he had, he took 21 seconds to come up with the correct answer of four. When asked to name them, Masiko could get only three correct—he gave his twin brother the name "Andrew" rather than "Arnold" (the name listed on his asylum application). Masiko fared no better with his sisters. "Patricia" figured prominently in his initial story, as she took him in after his parents disowned him. Masiko nonetheless listed no "Patricia" among his siblings in his asylum application. He mentioned a "Pat Masiko" in his sibling list, true, but Masiko never referred to "Patricia" as "Pat" in his testimony and indicated that he "never thought about" using that shortened form of her name. AR 425–26, 763, 770. Adding to this sibling-identity mystery (and ultimately to Masiko's incredibility), the envelope that "Patricia" supposedly sent Masiko listed "Patrick" as the sender.

Exacerbating these problems were Masiko's efforts to explain what happened in Uganda. He failed to mention some harrowing events altogether, and he changed important details in others. Take his account of the late-night five-man armed ambush in 2009. This story figured prominently in his asylum application—understandably so, considering that security officers supposedly shot at him as he ran to hide in nearby fields and considering that the life-threatening chase ultimately led to his forced resignation, participation in a gay rights demonstration and departure from Uganda. Despite its seeming salience, Masiko forgot about this event when testifying in court. He skipped past it on direct examination, and he missed a second opportunity to bring it up when the government walked him through his bill of particulars on cross-examination. Only after Masiko assured the court that he was "positive" that they had "covered everything, every encounter with the police," and only after the government read him his

statement from his asylum application, did he suddenly recall this deadly encounter. AR 276–77.

Masiko likewise faltered when describing his 2002 expulsion from King's College. According to the asylum application, Masiko and James were expelled because students "found [Masiko] *naked* on top of James and [they] were kissing," but according to Masiko's in-court testimony they were expelled because students found them kissing with "shirt[s] . . . and underpants on." AR 297, 774 (emphasis added). Masiko tried to fix this discrepancy in his follow-up hearing by claiming that "naked" means "uncustomary clothing or inadequate clothing" in Uganda. AR 357. This explanation damaged his credibility more as he could not produce a dictionary to support it and his corroborating Ugandan witness lied about being prepped on the word's "Ugandan meaning" before testifying. AR 513–15, 570–71, 578–80.

He offered contradictory accounts of his arrest and beating too. Masiko claimed that Ugandan security officers arrested, detained, and beat Timothy and him for two days in 2006 because they were found together outside a gay club. But the witness he called to back up this story, Ronaldlee Ejalu, said something else. He testified that Timothy "was not arrested," and indeed was not even at the gay club with Masiko, but learned about the arrest because Masiko "called Timothy and . . . told Timothy" about the incident after his release. AR 506–07. What's more, Ejalu was "positive" this event took place in 2005 and that Masiko only spent "[o]ne night" in jail, not two. *Id.*

Masiko also had difficulty proving that he was where he claimed to be during the relevant time period. Although he supposedly attended King's College for almost six years, he could not pinpoint its location in Uganda. Nor could he produce transcripts showing that he attended the

5

school. He could not correctly spell the name of his college, Makerere University. And although he did manage to produce Makerere transcripts, they conflicted with the rest of his story. The first set showed him starting on a bachelor's degree in business administration in 2002, during the time he was supposedly attending (and getting expelled from) King's College. The immigration judge alerted him to this inconsistency, prompting Masiko to come to his follow-up hearing with a second "official" set, showing a different year of registration (2003 rather than 2002) and a different degree program (commerce rather than business administration) in a differently formatted document with different seals and certifications. Masiko assured the court that the two transcripts differed because one was an official report of his college studies and the other was an unofficial report of his prerequisites taken at King's College. This explanation, though, raised more questions than it answered. Why did the registrar stamp and sign the unofficial transcript as a "certified true copy of [the] original"? Why would Makerere University list his King's College grades as part of a Makerere course of study? And why did the unofficial transcript issued in mid-2008 not show his whole course of study from 2003 to 2006 in addition to the supposed King's College prerequisites taken in 2002?

Noting fundamental inconsistencies in the who, what and where of Masiko's story (along with several other more minor problems), the immigration judge found Masiko not credible. He denied his applications for asylum, withholding of removal, and protection under the Convention Against Torture and declared them frivolous to boot. The Board affirmed the judge's adverse credibility ruling, but it reversed the frivolousness finding. Masiko petitioned us to review the Board's credibility decision.

II.

To be eligible for asylum, Masiko must demonstrate that he "is unable or unwilling to return to" Uganda because he fears persecution on account of his sexual orientation. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Credible testimony may satisfy this burden, but incredible testimony will not. *Id.* § 1158(b)(1)(B)(ii). The immigration judge gets substantial leeway to make the credibility call, and he may base his credibility finding on "the totality of the circumstances . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Id.* § 1158(b)(1)(B)(iii). His on-the-scene credibility determination, when affirmed by the Board, must be upheld if substantial evidence supports it. *See El-Moussa v. Holder*, 569 F.3d 250, 255–56 (6th Cir. 2009).

We see no reason to second guess the immigration judge's adverse credibility finding. Plenty of evidence supports it. Masiko testified inconsistently (and presented conflicting evidence) about who he was, what acts of persecution he suffered and where he suffered them. Each time he tried to explain a glaring inconsistency, things got worse—from a new story about the origins of his passport to lies about preparing his corroborating witness on the Ugandan definition of "naked" to conveniently different "official" transcripts from Makerere University. Nothing in Masiko's case compels us to conclude that the immigration judge missed this credibility call; if anything compels us, it is that the judge got it right. *See Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011).

Masiko challenges the immigration judge's adverse credibility finding on the theory that the cited discrepancies in his testimony did not "go to the heart of [his] asylum claim." Petitioner's Br. 16. This argument misses the mark twice over. For one, Masiko's inability to

7

prove who he is, what happened and where it took place undoubtedly goes to the heart of his claim; it indeed encompasses every aspect of his story and conceivably makes the whole tale, not just one or two chapters, a fiction. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 674–75 (6th Cir. 2008). For another, Masiko's application post-dates the REAL ID Act and thus a finding that he lacks credibility may rest on *any* inconsistency or set of inconsistencies "without regard to whether [they] go[] to the heart of [his] claim." 8 U.S.C. § 1158(b)(1)(B)(iii). *Falsus in uno, falsus in omnibus*—false in one, false in all.

Without any credible testimony to support his story, Masiko cannot prove that he fears persecution or torture in Uganda. He thus cannot make the showing necessary to obtain asylum, withholding of removal or protection under the Convention Against Torture.

For these reasons, we deny the petition for review.