NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0731n.06

No. 13-4433

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Sep 18, 2014

DEBORAH S. HUNT, Clerk

MATIAS SOLOMON TADESSE,               )
                                      )
    **Petitioner,**                  )          ON PETITION FOR REVIEW
                                      )          OF A FINAL ORDER OF THE
v.                                    )          BOARD OF IMMIGRATION
                                      )          APPEALS
ERIC H. HOLDER, JR., United States    )
Attorney General,                     )
                                      )          **OPINION**
    **Respondent.**                 )
                                      )

---

**BEFORE: MOORE and COOK, Circuit Judges; STEEH, District Judge.**[*]

    **KAREN NELSON MOORE, Circuit Judge.** Matias Solomon Tadesse, a native and citizen of Ethiopia, petitions for review of a Board of Immigration Appeals ("BIA") decision denying his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied Tadesse's application because it found Tadesse not credible, and the BIA affirmed this decision by adopting the IJ's order and providing additional support for the IJ's adverse credibility determination. On appeal, Tadesse argues that the IJ and BIA failed to consider Tadesse's explanations for inconsistencies in his testimony and seeks a remand so the IJ can determine

---

[*]The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

whether, after consideration of the totality of the circumstances, Tadesse is credible. Because the BIA's adverse credibility determination is supported by substantial evidence, we **DENY** Tadesse's petition for review.

## I. BACKGROUND

### A. Factual Background

Matias Tadesse was never active in Ethiopian politics. Administrative Record ("A.R.") at 170 (Hr'g Tr. at 58). His father, however, was an active member of a political party called the Coalition for Unity and Democracy—a party that opposed the ruling government in Ethiopia. *Id*. at 130–31 (Hr'g Tr. at 18–19); A.R. 246–51 (Hr'g Exhibit C). Tadesse's father unsuccessfully ran as a candidate for political office in 2005, and following the election, was imprisoned by the government for almost two years because of his membership in the opposition party. A.R. 132 (Hr'g Tr. at 20). According to Tadesse, the government released his father from prison only because he became very sick. *Id*. Tadesse's father died on December 20, 2007, just weeks after his release from prison. *Id*. at 132, 136 (Hr'g Tr. at 20, 24); A.R. 243 (Hr'g Exhibit B).

Despite not being involved in politics himself, Tadesse testified that after his father's death the government began to harass Tadesse because it believed he was "following [his] father's path." A.R. 132–33 (Hr'g Tr. at 20–21). According to Tadesse, police regularly followed him home from school, shoved and threw him to the ground, blocked his path with police vehicles, and threatened to kill him. *Id*.

In addition to the government, Tadesse testified that an opposition group made up of guerrilla fighters known as the Patriotic Front began harassing him in early 2006. *Id*. at 134 (Hr'g Tr. at 22). This group wanted Tadesse to join their opposition movement to fight the government and avenge his father's death. *Id*. Tadesse testified that he refused to join. *Id*. at 135 (Hr'g Tr. at 23). As a result, Tadesse was abducted by the group and taken at gunpoint to a training camp in the jungle where he was forced to participate in training activities. *Id*. at 135–39 (Hr'g Tr. at 23–27). When he refused to train, Tadesse testified that he was severely beaten with a stick. *Id*. at 139 (Hr'g Tr. at 27). After about one week at the training facility, Tadesse and a man named Yusef, an individual Tadesse had known prior to his abduction, escaped from the camp. *Id*. at 140–41 (Hr'g Tr. at 28–29). Following their escape, Tadesse hid in his house for days out of fear that his abductors were looking for him. *Id*. at 142 (Hr'g Tr. at 30). Although the guerrilla fighters never came for him, Tadesse claims that Yusef was shot dead while on his front porch just a week after their escape by the same guerrilla fighters who abducted them. *Id*. at 142–43 (Hr'g Tr. at 30–31). Tadesse did not tell the police about the abduction because he feared the government would think that he joined an opposition party. *Id*. at 143 (Hr'g Tr. at 31).

After discussing the details of his abduction with his mother, Tadesse left his home to live with his aunt in the Ethiopian city of Addis Ababa to hide from the government. *Id*. at 142–44 (Hr'g Tr. at 30–32). During that time, Tadesse helped serve as an interpreter for an aid worker from Boston, Massachusetts. *Id*. at 144 (Hr'g Tr. at 32). Through sponsorship from the

aid worker, Tadesse was able to come to the United States as a visitor on August 18, 2008. *Id*. at 144–45 (Hr'g Tr. at 32–33). Tadesse testified that he stayed at his sponsor's home in Boston for about a month before moving to Columbus, Ohio. *Id*. at 145 (Hr'g Tr. at 33). In Columbus, Tadesse attended high school and lived with a man named Seifu Begashaw, who promised to help Tadesse apply for asylum in the United States. *Id*. at 145–46 (Hr'g Tr. at 33–34). But, despite Tadesse's requests for help, Begashaw would not assist Tadesse with his asylum application. *Id*. at 147–48 (Hr'g Tr. at 36–37).

**B. Procedural History**

In February 2010, Tadesse filed an Application for Asylum and for Withholding of Removal. A.R. 394 (I-589 Form at 1). In his application, Tadesse stated that he sought asylum and withholding of removal based on political opinion and the Convention Against Torture. *Id*. at 398 (I-589 Form at 5). Two months later, Tadesse was served a Notice of Hearing in Removal Proceedings. A.R. 453 (Notice of Hearing). At his removal hearing, Tadesse did not contest that he remained in the United States without authorization and was thus subject to removal. A.R. 119 (Hr'g Tr. at 7); A.R. 454 (Notice to Appear). Tadesse testified, however, that he was seeking asylum in the United States because he believed that his father's political opinion had been imputed to him, and he was afraid to return to Ethiopia because the Ethiopian government would make him suffer, torture him, or "even kill [him.]" A.R. 125, 152, 156 (Hr'g Tr. at 13, 40, 44). He testified that his family in Ethiopia is not safe, noting that his mother was recently arrested and his brother has been threatened by the police. *Id*. at 153–54 (Hr'g Tr. at 41–42).

4

The Immigration Judge ("IJ") did not find Tadesse to be a credible witness. A.R. 95 (Oral Decision of the IJ at 16). The IJ determined that Tadesse's testimony "was internally inconsistent" and "conflicted with his supporting documentation," and his answers on cross-examination "were evasive and were non-responsive." *Id.* at 95–96 (Oral Decision of the IJ at 16–17). In support, the IJ presented "a representative, but not necessarily exhaustive list of inconsistencies in [Tadesse's] testimony." *Id.* at 96 (Oral Decision of the IJ at 17). These included the following:

(1) Tadesse testified that the Patriotic Front abducted him in September 2007 to "avenge his father's death," but then "changed his testimony" on cross-examination to state that he was abducted in late 2007 when it was noted that his father died in December 2007, *id.* at 96 (Oral Decision of the IJ at 17);

(2) Tadesse testified that he was beaten at the training camp, but this was not in his personal statement or asylum application, *id.* at 97 (Oral Decision of the IJ at 18);

(3) Tadesse testified that when he arrived in the United States he stayed in Boston for one month, but then later testified that he went directly to Columbus, and his personal statement said he traveled to Atlanta, Georgia before moving to Columbus, *id.*;

(4) Tadesse testified that when he lived in Columbus, Begashaw "didn't want me to have contact with other people or even leave the house," but Begashaw enrolled Tadesse in a public high school, *id.* at 97–98 (Oral Decision of the IJ at 17–19);

(5) Tadesse was "evasive and non-responsive" when asked about the physical harm he received from government agents or police, *id.* at 98 (Oral Decision of the IJ at 19);

(6) Tadesse testified that Yusef was killed by guerrilla fighters one week after they escaped from the training camp in 2007, but his mother wrote a letter stating that Yusef was shot for selling t-shirts during a peaceful demonstration in 2005, *id.*; and

(7) Tadesse gave conflicting testimony about the contents of his visa application—first, he stated that he knew the contents of his visa application, but then during cross-

examination testified that he did not understand what a visa application even is, *id*. at 98–99 (Oral Decision of the IJ at 19–20).

Based on these findings, the IJ denied Tadesse's application. The IJ also found Tadesse's application untimely, and it determined that Tadesse had offered insufficient evidence to support his claim that he experienced past persecution or had a well-founded fear of future persecution based on political opinion, or that he would be tortured if returned to Ethiopia. *Id*. at 100–08 (Oral Decision of the IJ at 21–29).

The BIA affirmed the IJ's adverse credibility determination and dismissed Tadesse's appeal. The BIA held that the IJ based its credibility determination on "specific, cogent reasons" and cited as examples a number of the above "inconsistencies" to support this holding. A.R. 3–4 (BIA Decision at 1–2). In addition to these inconsistencies, the BIA found that Tadesse's testimony that he lived with his aunt in Addis Ababa for one year before coming to the United States conflicted with his asylum application, which stated that he lived in Addis Ababa from March 2008 to August 2008. *Id*. at 4 (BIA Decision at 2). The BIA also found that Tadesse had not provided sufficient evidence to show that he would be tortured if he returned to Ethiopia. *Id*. at 4–5 (BIA Decision at 2–3). Because it upheld the IJ's credibility determination, the BIA did not address whether Tadesse's application was timely. *Id*. at 5 (BIA Decision at 3). This appeal followed.

No. 13-4433
*Tadesse v. Holder*

## II. STANDARD OF REVIEW

On appeal, Tadesse challenges the IJ's and BIA's credibility determinations.[1] "Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id*. All legal determinations made by the IJ or BIA are reviewed de novo. *Id*. "[C]redibility determinations are considered findings of fact and are reviewed under the substantial evidence standard." *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011) (citing *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004)). Under this deferential standard, "[w]e will reverse a credibility determination only if any reasonable adjudicator would be compelled to conclude to the contrary." *Id*. (citing *Pergega v. Gonzales*, 417 F.3d 623, 627 (6th Cir. 2005)). Thus, we cannot reverse the IJ's or BIA's credibility findings simply because we would have decided the issue differently. *Abdramane v. Holder*, --- F. App'x ----, No. 12-3199, 2014 WL 2766543, at *3 (6th Cir. June 18, 2014).

---

[1]Tadesse does not appeal the BIA's holding that he provided insufficient evidence that he would be tortured if returned to Ethiopia. And while Tadesse initially contested the IJ's ruling that his application was untimely, he dropped that challenge in his reply brief because the BIA had not rested its decision on timeliness. Petitioner Reply at 11–12. Thus, these issues are not before us on appeal.

7

## III. ANALYSIS

The issue on appeal is whether the IJ's and BIA's adverse credibility determinations are supported by substantial evidence. Because Tadesse filed his asylum application in 2009, the "stricter review" of credibility determinations provided by the REAL ID Act of 2005, Pub.L. No. 109–13, 119 Stat. 302, applies. *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). "Under the REAL ID Act, credibility determinations are based on the 'totality of the circumstances' and take into account 'all relevant factors.'" *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The statute includes as relevant factors:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii). "The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention." *El-Moussa*, 569 F.3d at 256 (citing 8 U.S.C. § 1229a(c)(4)(C)).

Tadesse argues that the IJ's and BIA's adverse credibility determinations were improper because they ignored Tadesse's explanations for the "perceived inconsistencies" in his testimony, which is contrary to the "totality of circumstances" test set forth in § 1158(b)(1)(B)(iii). Petitioner Br. 9–10. In particular, Tadesse claims that the IJ and BIA failed

to consider "the difficulty Tadesse had in converting dates from the Ethiopian to American calendar or its role in the creation of inconsistencies in his testimony, though the explanation was raised by Tadesse, [witness Tsegaye] Negera, and counsel." *Id*. at 19–20. Instead, Tadesse argues that the IJ simply found his testimony not credible by "cherry-picking" facts that supported an adverse credibility finding. *Id*. at 16, 22–23. Tadesse argues that because the process by which the IJ arrived at his credibility determination was flawed, remand is necessary to determine Tadesse's credibility after proper consideration of the "totality of the circumstances." Petitioner Reply at 2.

Tadesse's arguments fail because they overlook the relevant standard—we must affirm an adverse credibility determination that is based on substantial evidence. *Hachem*, 656 F.3d at 434. Contrary to Tadesse's position, this is true regardless of whether all of the bases for an adverse credibility determination have merit or were properly considered by the IJ or BIA. *See, e.g.*, *Ndrecaj v. Mukasey*, 522 F.3d 667, 675 (6th Cir. 2008) ("[W]e cannot say that the evidence compels a conclusion at odds with the IJ's [credibility] decision" even though "[m]ost of the inconsistencies that the IJ mentioned were irrelevant or not even inconsistencies at all."); *see also Al Ameri v. Holder*, 361 F. App'x 641, 645 (6th Cir. 2010) ("[S]o long as one of the identified grounds [for the adverse credibility finding] is supported by substantial evidence, we must accept the IJ's determination") (internal quotation marks omitted) (alteration in original) (quoting *Yang Lin v. Holder*, 320 F. App'x 428, 432 (6th Cir. 2009)). Indeed, here the IJ and BIA specifically listed a number of inconsistencies in their credibility findings that have nothing

to do with Tadesse's difficulty remembering relevant dates. Yet, Tadesse largely ignores these inconsistencies in his appeal.

For example, the differences between the Ethiopian calendar and the Gregorian calendar used in the United States do not explain the inconsistency between Tadesse's claim that Yusef was shot by guerrilla fighters in front of his home in 2007 just a week after their escape from a training camp, A.R. 142–43 (Hr'g Tr. at 30–31), and his mother's letter, which stated that Yusef was shot in 2005 for selling t-shirts during a peaceful protest, A.R. 262 (Hr'g Exhibit D). Tadesse did not testify that this inconsistency was based on the differences between calendars. A.R. 177 (Hr'g Tr. at 65). Moreover, there is little doubt that Tadesse and his mother were talking about the same person—Tadesse testified that he had one friend named Yusef, *id.* at 165 (Hr'g Tr. at 53), and he consulted with his mother following his abduction and told her "all the things that happened" leading up to his move to Addis Ababa, *id.* at 142, 176 (Hr'g Tr. at 30, 64). Given the significance of a friend being gunned down on his front doorstep just days after escaping the abductors' camp, by the same guerrilla fighters who abducted Tadesse, we would expect that Tadesse's testimony would be corroborated by—or at least not conflict with—his mother's letter.

In addition, Tadesse fails to contest the IJ's finding that Tadesse was "evasive and non-responsive" when asked about physical harm he suffered from the government. *See Preldakaj v. Keisler*, 252 F. App'x 79, 84 (6th Cir. 2007) ("Immigration judges are better positioned to discern credibility and assess the facts with the witnesses before them") (internal quotation

marks omitted). Nor does Tadesse explain why we should not credit the IJ's credibility assessment regarding: the seemingly minor inconsistencies surrounding Tadesse's testimony about Begashaw restricting his access to others; Tadesse's testimony about the length of time he lived with his aunt in Addis Ababa; or Tadesse's conflicting testimony about the contents of his visa application. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("relevant factors" include the "responsiveness of the applicant[,] . . . the internal consistency of each such statement[,] . . . and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.*") (emphasis added).

Based on these inconsistencies alone, the IJ's and BIA's adverse credibility determinations are supported by substantial evidence. *See El-Moussa*, 569 F.3d at 256 (credibility findings that "are supported by the record[] entitle the IJ's overall adverse credibility determination to deference, regardless of whether the inconsistencies bear on the heart of [petitioner's] claim."). In particular, the inconsistencies regarding Yusef's death and the IJ's citation to specific instances in which Tadesse was "evasive and non-responsive" support this finding. Given the above inconsistencies, which remain largely uncontested by Tadesse, no reasonable adjudicator would feel "compelled" to find Tadesse's claims credible. *Hachem*, 656 F.3d at 434. Thus, contrary to Tadesse's claim, even if the IJ and BIA failed to consider reasonable explanations for the other "inconsistencies" in Tadesse's testimony, we must affirm the adverse credibility determination. *See Ndrecaj*, 522 F.3d at 675 (affirming the IJ's credibility

determination despite the fact that "[m]ost of the inconsistencies that the IJ mentioned were irrelevant or not even inconsistencies at all."); *Lulonga v. Holder*, 410 F. App'x 897, 901–02 (6th Cir. 2010) (holding that the IJ's credibility finding was based on substantial evidence even though "other inconsistencies identified by the IJ do not provide such support"); *Singh v. Ashcroft*, 398 F.3d 396, 403–04 (6th Cir. 2005) (affirming IJ's credibility determination despite the IJ "rely[ing] on a number of questionable assumptions and conclusions").

## IV. CONCLUSION

Because the BIA's adverse credibility determination is supported by substantial evidence, we **DENY** Tadesse's petition for review.